DAVID C. SHONKA
Acting General Counsel

SARAH SCHROEDER, Cal. Bar No. 221528
ROBERTA TONELLI, Cal. Bar No. 278738
EVAN ROSE, Cal. Bar No. 253478
BORIS YANKILOVICH, Cal. Bar No. 257887
Federal Trade Commission
901 Market Street, Suite 570
San Francisco, CA 94103
sschroeder@ftc.gov, rtonelli@ftc.gov, erose@ftc.gov,
byankilovich@ftc.gov
Tel: (415) 848-5100; Fax: (415) 848-5184

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN FINANCIAL BENEFITS CENTER, a corporation, also d/b/a AFB and AF STUDENT SERVICES;<br><br>AMERITECH FINANCIAL, a corporation;<br><br>FINANCIAL EDUCATION BENEFITS CENTER, a corporation; and<br><br>BRANDON DEMOND FRERE, individually and as an officer of AMERICAN FINANCIAL BENEFITS CENTER, AMERITECH FINANCIAL, and FINANCIAL EDUCATION BENEFITS CENTER,<br><br>Defendants. | Case No. __4:18-cv-0806__<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), in connection with their deceptive marketing and sale of student loan debt relief services.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), and 6102(c).

## DEFENDANTS

6. Defendant American Financial Benefits Center ("AFBC"), also doing business as AFB and AF Student Services, is a California corporation. AFBC has held itself out as doing business at 311 Professional Center Drive, Suite 200, Rohnert Park, CA 94928 and 1900 Powell Street, Suite 600, Emeryville, CA 94608. AFBC was incorporated in California in February 2011. AFBC transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 10, AFBC has advertised, marketed, distributed, or sold student loan debt relief services to consumers throughout the United States.

7. Defendant AmeriTech Financial ("AmeriTech") is a California corporation. AmeriTech has held itself out as doing business at 1101 Investment Boulevard, Suite 290, El Dorado Hills, CA 95762 and 5789 State Farm Drive, Suite 265, Rohnert Park, CA 94928. AmeriTech was incorporated in California in October 2015. AmeriTech transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 10, AmeriTech has advertised, marketed, distributed, or sold student loan debt relief services to consumers throughout the United States.

8. Defendant Financial Education Benefits Center ("FEBC") is a California corporation that has stated in public documents that 2010 Crow Canyon Place, Suite 100, San Ramon, CA 94583 is its principal executive office. FEBC was incorporated in California in October 2015. FEBC transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in Paragraph 10, FEBC has advertised, marketed, distributed, or sold student loan debt relief services to consumers throughout the United States.

9. Defendant Brandon Demond Frere ("Frere") founded AFBC, AmeriTech, and FEBC and is majority owner of the companies. He currently serves as CEO of the Corporate Defendants. Frere resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

10. Defendants AFBC, AmeriTech, and FEBC (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, and employees. AmeriTech's November 2015 application to the Better Business Bureau described AFBC as the "parent" and AmeriTech as the "child." AFBC and AmeriTech commingle their funds. For example, AFBC and AmeriTech bank records show consistent, substantial payments between these accounts. AmeriTech and FEBC sell their services together and provide service contracts simultaneously to consumers. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendant Frere has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

11. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' DECEPTIVE BUSINESS PRACTICES

12. Since 2014 and continuing thereafter, Defendants have operated a debt relief enterprise that has tricked consumers out of millions of dollars. Defendants distribute mailers to consumers claiming that consumers are eligible for federal programs that would permanently reduce their monthly loan payments to a fixed amount or result in total loan forgiveness. Defendants collect an advance fee of between $600-800, purportedly to enroll consumers in federal loan assistance programs. In numerous instances, the consumer was not enrolled in the promised federal loan program. In some instances, not only has the consumer's loan balance not diminished, but it has also accrued interest.

13. In addition to the advance fees, Defendants also collect and retain monthly fees that consumers believe are being applied to pay down their loans, but are actually going towards a membership to a "financial education" program that includes access to various resources unrelated to their student loans. Defendants have collected over $28 million from consumers.

**Background on Student Loan Forgiveness and Repayment Programs**

14. Student loan debt is the second largest class of consumer debt; more than 42 million Americans collectively owe nearly $1.34 trillion. The student loan market shows elevated levels of distress relative to other types of consumer debt.

15. To address this mounting level of distressed debt, the Department of Education ("ED") and state government agencies administer a limited number of student loan forgiveness and discharge programs. Most consumers, however, are not eligible for these programs because of strict eligibility requirements. For example, one program requires the consumer to demonstrate a total and permanent disability; another applies only to consumers whose school closed while the consumer was still enrolled. A third program, the Borrower Defense to Repayment ("BDR"), may provide a loan discharge if the school, through an act or omission, violated state law directly related to the borrower's federal student loan or to the educational services for which the loan was provided.

16. Other forgiveness programs require working in certain professions for a period of years. Teacher Loan Forgiveness applies to teachers who have worked full-time for five years in a low-income elementary or secondary school or educational service agency. Public Service Loan Forgiveness ("PSLF") applies to employees of governmental units or non-profit organizations who make timely monthly payments for a period of ten years while employed in the public sector.

17. The federal government also offers loan forgiveness through income-driven repayment ("IDR") programs that enable borrowers to reduce their monthly payments and have portions of their loans forgiven. As of September 2017, no loans had been forgiven under any of the IDR programs. IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income. To remain in an IDR program,

borrowers must recertify their income and family size annually. Obtaining forgiveness through IDR programs requires a minimum of 20 or 25 years of qualifying payments.

18. Because a borrower's income is likely to fluctuate over the life of the loan, monthly payments under the IDR programs can vary considerably from year to year. If a borrower's income were to increase over the repayment period, for example, the monthly payment amount could correspondingly increase to the point where those payments would pay off the loan before any amount could be forgiven at the end of the repayment term.

19. Consumers can apply for BDR, PSLF, IDR, and other loan repayment and forgiveness or discharge programs through ED or their student loan servicers at no cost; these programs do not require the assistance of a third-party company or payment of application fees.

20. ED will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship. During forbearance, unpaid interest adds to the principal balance.

21. ED also allows consumers with multiple federal loans to consolidate them into one "Direct Consolidation Loan" with a fixed interest rate and single monthly payment. ED does not charge for consolidation and offers a dedicated helpline and webpage to assist borrowers with the process.

**Defendants' Deceptive Marketing of Student Loan Debt Relief Services**

22. Since at least 2014 and continuing thereafter, Defendants have disseminated, or have caused to be disseminated, personalized mailers to consumers throughout the United States, including but not necessarily limited to the attached Exhibits A-E. These mailers have contained the following statements:

    a. Exhibit A-1. (dated "reply by 12/31/14")

       STUDENT LOAN PAYMENT REDUCTION – PRE-QUALIFICATION NOTICE

       . . . .

       You have been Pre - Qualified to reduce your student loan payments through the Student Loan Document Preparation and Processing Services Program.

1 . . . .
2 Your student loan has been identified as eligible for the Student Loan Reform
3 Act which can save you thousands on your current student loans. You are
4 now eligible to reduce your estimated monthly payments of **$1,110** down to as
5 low as **$68** . . . .
6    b. Exhibit B-1. (dated "Deadline: March 28, 2014")
7 Due to the current status of your student loans, your pre-qualification may
8 allow you to reduce your current monthly payments of approximately $480
9 down to as low as $60, and may also qualify for complete 100% total loan
10 forgiveness and other available programs.
11 . . . .
12 PRE-QUALIFIED* FIXED PAYMENTS & TERMS
13 [tables containing, among other things, "*Estimated Monthly Payment" terms]
14    c. Exhibit C. (undated)
15 Student Loan Payment Reduction & Forgiveness
16 . . . .
17 We are pleased to inform you that you may now participate in the Student
18 Loan Document Preparation and Processing Services Program. **This**
19 **program can immediately assist you in potentially saving thousands on**
20 **your student loans**.
21    d. Exhibit D-1. (dated "2017")
22 With the implementation of the **Health Care and Education Affordability**
23 **Reconciliation Act of 2010** the U.S. Department of Education has adjusted
24 their re-payment policies.
25 **You may now be eligible for:**
26 . . . .
27      OFFER TYPE     **Loan Forgiveness**
28      LOAN TYPE     **Federal Student Loan**

|   |   |   |
|---|---|---|
| 1 | REFERENCE # | [personalized number] |
| 2 | OFFER STATUS | **Eligible** |

. . . .

- Total Loan Forgiveness Programs

e. Exhibit E-2. (undated)

With the implementation of the **Health Care and Education Affordability Reconciliation Act of 2010**, the U.S. Department of Education has adjusted their [sic] re-payment policies.  You may now be eligible for:

✓ **$0/ month Monthly Student Loan Payment**

✓ **No Minimum Income Requirement or Credit Check**

✓ **Loan Forgiveness Programs**

✓ **No Impact on your Credit Rating or Score**

✓ **No Program Payment for up to 90 days**

23. Defendants' mailers do not advertise or describe a monthly membership to any service.  Exhibits A-E.

24. Defendants' mailers create a sense of urgency by indicating that the offers are available for a limited time only or by stating, "[F]ailure to respond to this letter may void company offer for services."  Exhibit D-1; *see also* Exhibits B-C.

25. In numerous instances, Defendants did not include the names American Financial Benefits Center, AmeriTech Financial, or Financial Education Benefits Center on mailers they sent consumers.

26. The mailers list a toll-free phone number where consumers can reach Defendants.  When consumers call Defendants, they are connected to one of Defendants' sales agents.  The recorded message that consumers hear while waiting for a sales agent has stated:  "You have reached the program enrollment department," and "[T]o speak with an account specialist regarding an important notice you've received, please stay on the line."

27. Defendants tell consumers that their new monthly payment amount will be their payment amount for the next ten or 20 years, and that thereafter, the consumers' remaining loan

1  balances will be forgiven.  Defendants also tell consumers that they will save a specific amount
2  of money, usually in the thousands of dollars, by enrolling in the program Defendants describe.

3      28.    Defendants make false or unsubstantiated representations to consumers about
4  their eligibility for IDR programs based on inaccurate family size and income information.  For
5  example, Defendants inform consumers that they are allowed to inflate their family size on the
6  IDR application.  In a recorded call, one of Defendants' sales representatives, when describing
7  how to count family size, told a consumer:

8          Now, support includes any kind of money – gifts, loans, housing, food, clothing,
9          car, medical or dental, payment of college costs.  Do you help anybody – if you
10         have somebody on your cell phone plan; if you have somebody on your gym
11         membership, they're considered part of your family.  And we just had Christmas.
12         You know, if you bought presents, clothes, watch, earrings, toilet paper, they're a
13         part of your family.

14     29.    "Family size" for the IDR programs "means the number that is determined by
15 counting the borrower, the borrower's spouse, and the borrower's children, including unborn
16 children who will be born during the year the borrower certifies family size, if the children
17 receive more than half their support from the borrower.  A borrower's family size includes other
18 individuals if, at the time the borrower certifies family size, the other individuals - (i) Live with
19 the borrower; and (ii) Receive more than half their support from the borrower and will continue
20 to receive this support from the borrower for the year the borrower certifies family size."  34
21 C.F.R. § 682.215(a)(3).

22     30.    The family size listed on an IDR program application affects eligibility for these
23 programs and the monthly amount a consumer will have to pay.  Because of Defendants'
24 misrepresentations about family-size requirements, consumers may be improperly enrolled in
25 federal student loan programs for which they do not qualify.

26     31.    Defendants' representations that they are able to procure a permanent reduction in
27 consumers' monthly payments are also false or unsubstantiated because none of ED's IDR
28 programs guarantees consumers a fixed, reduced monthly payment for more than one year.

1   Under ED's IDR programs, monthly payments fluctuate based on consumers' income in a given
2   year, which consumers must recertify annually, and the amount forgiven depends on what
3   remains unpaid at the end of the repayment period.  In many cases, consumers' income will rise
4   over the years-long repayment period, and as consumers' income rises, so will their monthly
5   payment in a given year.  As a result, the amount that would be forgiven at the end of the
6   repayment term typically would be less than Defendants have promised.

7       32.    After Defendants have convinced consumers to enroll in a federal program and
8   turn over their payment information, Defendants email consumers a link to a lengthy contract
9   that consumers are required to sign electronically.  As consumers remain on the phone,
10  Defendants pressure them to quickly click through the document and electronically sign multiple
11  pages.  In some instances, Defendants represent that consumers do not need to read the
12  agreement carefully because the information contained in the contract was already discussed in
13  the call.  At the end of the calls, Defendants transfer consumers to the Verification Department
14  where employees quickly read lengthy disclosures to consumers.

15      33.    Defendants charge consumers an advance fee for "document preparation" ranging
16  from $600 to $800, which Defendants generally collect over one to six installments, before
17  attempting to enroll consumers in any federal program.

**Defendants' Deceptive Marketing of "Financial Education" Memberships**

19      34.    In addition to charging an advance fee, since 2014 and continuing thereafter,
20  Defendants have also charged consumers a monthly fee for the life of their loan, typically 10-25
21  years.  The monthly fee ranges between $49 and $99.  Defendants represent in communications
22  with consumers that the monthly fee will be used to pay down consumers' loans.  For example,
23  Defendants told one consumer, "Your quote based on your current situation is $255 for 1 month
24  then it would drop down to $235 for an additional 6 months then it will be $99 for the remainder
25  of your loan term, if your situation stays the same, which would be 25 years."  Exhibit F.

26      35.    In fact, Defendants apply the monthly fees they receive from consumers towards
27  memberships to their "financial education" program.  The membership fees, which agents rarely
28  discuss during the sales call, are used to pay for access to various resources unrelated to

consumers' student loans, such as "Key Ring & Luggage Protection," "Everyday Grocery Savings," "Auto Buying Service and Maintenance Discounts," "Financial Calculators," "medical and wellness discounts," and "Access to Dozens of Informational & Useful Web links." *See, e.g.,* Exhibit G (contract excerpts). The explanation of what members receive often is buried in the middle of the numerous documents that Defendants provide to consumers. Exhibit H-17. Many consumers believe that their monthly payments to Defendants are going toward paying their student loan balance, not a membership program unrelated to their student loan. In addition to the monthly membership fee, Defendants charged consumers an enrollment fee to their "financial education" program ranging from $100 to $1,300.

36. Defendants' collection notices further reinforce their representation that consumers' monthly payments are going towards their student loans. If a consumer misses a monthly payment for Defendants' "financial education" program, Defendants send them a notice stating, "**RE: Student Loan Payment** . . . **\*\*\*YOUR FILE IS CURRENTLY ON HOLD\*\*\*** . . . \*\*\* Don't risk falling behind on your payments", or similar language. Exhibit I.

37. Defendants often refuse to provide refunds to consumers. In some instances, Defendants have provided only partial refunds that are substantially less than what consumers paid to Defendants.

**Role of Individual Defendant Brandon Frere**

38. At all times material to this Complaint, acting alone or in concert with others, Brandon Frere has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.

39. Frere is majority owner of AFBC. He incorporated AFBC in 2011 and has served as the company's CEO, Secretary, CFO, and sole Director since that time. Frere has signed contracts with consumers on behalf of AFBC as a "Managing Director" of the company. As an owner and officer of AFBC, Frere has the authority to control the acts of the company.

40. Frere is majority owner of AmeriTech. He incorporated AmeriTech in 2015 and has served as the company's CEO, Secretary, CFO, and sole Director since that time. As an owner and officer of AmeriTech, Frere has the authority to control the acts of the company.

41. Frere is majority owner of FEBC. He incorporated FEBC in 2015 and has served as the company's CEO, Secretary, CFO, and sole Director since that time. As an owner and officer of FEBC, Frere has the authority to control the acts of the company.

42. At all times material to this Complaint, Frere has been a signatory on AFBC's and AmeriTech's depository bank accounts.

43. In late 2015, Frere submitted an application to the Better Business Bureau serving Northeast California ("BBB") seeking accreditation for AmeriTech. In June 2016, the BBB sent Frere a letter describing consumer complaints about AmeriTech. Specifically, the BBB told Frere that consumers "have alleged that they are being scammed by AmeriTech" and "allege they were [led] to believe the payments being made to your company were going towards their student loan debt, only to find out later that this was not the case." The BBB continued to express concerns about AmeriTech's business practices until June 2017, when AmeriTech informed the BBB that it was closing its office in the Sacramento area.

44. As the owner, high-ranking corporate officer, and active participant in the daily activities of the Corporate Defendants, Frere knew the Corporate Defendants' representations to consumers were false or unsubstantiated, was recklessly indifferent to the truth or falsity of such representations, or was aware of a high probability that the representations were fraudulent and intentionally avoided the truth.

## THE FTC ACT

45. Section 5(a) of the FTC Act, 15 U.S.C. §45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

46. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

# VIOLATIONS OF THE FTC ACT
## Count I
### Deceptive Student Loan Debt Relief Representations

47. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a. Consumers' monthly payments to Defendants would be applied toward consumers' student loans; and

    b. Consumers were qualified for, or were approved to receive, loan forgiveness or other programs that would permanently lower or eliminate their loan payments or balances.

48. In truth and in fact, in numerous instances in which Defendants made the representations set forth in Paragraph 47 of this Complaint, such representations were false or not substantiated at the time Defendants made them.

49. Therefore, Defendants' representations as set forth in Paragraph 47 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

50. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

51. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §§ 310.2(dd), (ff), (gg). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(dd). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a

1    charitable contribution, by use of one or more telephones and which involves more than one
2    interstate telephone call.  16 C.F.R. § 310.2(gg).

3    52.    Defendants are sellers or telemarketers of "debt relief services" as defined by the
4    TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service
5    represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of
6    payment or other terms of the debt between a person and one or more unsecured creditors,
7    including but not limited to a reduction in the balance, interest rate, or fees owed by a person to
8    an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

9    53.    The TSR prohibits sellers and telemarketers from requesting or receiving payment
10   of any fees or consideration for any debt relief service until and unless:

    a.    The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

    b.    The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and

    c.    To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

        i.    Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount.  The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

        ii.   Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  The percentage charged cannot change from one individual debt to another.  The amount saved is the difference between the amount owed at the time the debt was

1 enrolled in the service and the amount actually paid to satisfy the debt.  16 C.F.R. § 310.4(a)(5)(i).

54. The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service.  16 C.F.R. § 310.3(a)(2)(x).

55. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE TELEMARKETING SALES RULE**
**Count II**
**Advance Fee for Debt Relief Services**

56. In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants have requested or received payment of a fee or consideration for debt relief services before:

    a. Defendants had renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

    b. The customer had made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

57. Defendants' acts or practices, as described in Paragraph 56 of this Complaint, are abusive telemarketing acts or practices that violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. §310.4(a)(5)(i).

**Count III**
**Material Debt Relief Misrepresentations**

58.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including that:

    a.   Consumers' monthly payments to Defendants would be applied toward consumers' student loans; and

    b.   Consumers were qualified for, or are approved to receive, loan forgiveness or other programs that will permanently lower or eliminate their loan payments or balances.

59.     Defendants' acts and practices, as described in Paragraph 58 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

### CONSUMER INJURY

60.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

### THIS COURT'S POWER TO GRANT RELIEF

61.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

62.     Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from

Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, a preliminary injunction, appointment of a receiver, and an asset preservation order;

B. Enter a permanent injunction to prevent future violations of the FTC Act and the TSR;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: February 7, 2018

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

*Sarah Schroeder*

Sarah Schroeder
Roberta Tonelli
Evan Rose
Boris Yankilovich
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION