DAVID C. SHONKA
Acting General Counsel

SARAH SCHROEDER, Cal. Bar No. 221528
ROBERTA TONELLI, Cal. Bar No. 278738
EVAN ROSE, Cal. Bar No. 253478
Federal Trade Commission
901 Market Street, Suite 570
San Francisco, CA 94103
sschroeder@ftc.gov, rtonelli@ftc.gov, erose@ftc.gov
Tel: (415) 848-5100; Fax: (415) 848-5184

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> AMERICAN FINANCIAL BENEFITS CENTER, a corporation, also d/b/a AFB and AF STUDENT SERVICES; <br><br> AMERITECH FINANCIAL, a corporation; <br><br> FINANCIAL EDUCATION BENEFITS CENTER, a corporation; and <br><br> BRANDON DEMOND FRERE, individually and as an officer of AMERICAN FINANCIAL BENEFITS CENTER, AMERITECH FINANCIAL, and FINANCIAL EDUCATION BENEFITS CENTER, <br><br> Defendants. | Case No. 18-cv-00806-SBA <br><br> **FEDERAL TRADE COMMISSION'S MOTION FOR PRELIMINARY INJUNCTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date: May 9, 2018 <br> Time: 1:00 p.m. <br> Location: Courtroom 210 <br> 1301 Clay Street, 2nd Floor <br> Oakland, CA 94612 <br> Judge: Hon. Saundra Brown Armstrong |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................iii

I.      NOTICE OF MOTION AND MOTION ...................................................... 1

II.     INTRODUCTION................................................................................. 1

III.    THE PARTIES.................................................................................... 2

  A.    Plaintiff................................................................................... 2

  B.    Defendants.............................................................................. 2

IV.     DEFENDANTS' UNLAWFUL BUSINESS PRACTICES ........................... 3

  A.    Defendants Falsely Promise Fixed Monthly Loan Payments, Loan Forgiveness,
        and Eligibility for Government Programs.................................... 4

    1.  Defendants' Mailers Falsely Promise Student Loan Payment Reduction and
        Loan Forgiveness ................................................................ 5

    2.  Defendants' Sales Calls Reinforce False Promises ................... 5

    3.  Defendants Misrepresent Consumers' Eligibility for IDR Programs .................. 7

  B.    Defendants Mislead Consumers to Extract Monthly Charges and Illegal Advance
        Fees ...................................................................................................9

    1.  Illegal Advance Fees ........................................................... 9

    2.  Deceptive Monthly Charges.................................................. 10

  C.    Defendants' High-Pressure Tactics Prevent Consumers from Discovering
        Misrepresentations................................................................ 12

  D.    Defendants Cut Off Consumers' Communications with Loan Servicers and the
        Department of Education to Prevent Discovery of the Scam ........... 14

V.    THE FTC HAS SHOWN A LIKELIHOOD OF SUCCESS AND THE EQUITIES WEIGH IN FAVOR OF THE REQUESTED RELIEF .......................................................... 15

    A.    This Court Has the Authority to Grant the Requested Relief ................................. 15

    B.    Legal Standard for Issuing a Preliminary Injunction ................................. 16

    C.    The FTC Has Demonstrated a Likelihood of Success on the Merits...................... 16

        1.    Defendants' Misrepresentations Violate the FTC Act ......................................... 16

        2.    Defendants' Misrepresentations and Upfront Fees Violate the TSR.................. 18

    D.    The Equities Favor Granting the Preliminary Injunction ...................................... 20

VI.    THE LIABILITY OF DEFENDANTS ............................................................ 21

    A.    Corporate Defendants Are Liable as a Common Enterprise................................. 21

    B.    Defendant Frere Is Liable for Monetary and Injunctive Relief............................. 22

VII.    A PRELIMINARY INJUNCTION WITH EQUITABLE RELIEF IS NECESSARY ……………………………………………………………….……………… 24

    A.    Preliminary Injunction ............................................................................. 24

    B.    Appointment of a Temporary Receiver ................................................. 24

VIII.    CONCLUSION....................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*CFPB v. Irvine Webworks*, No. 14-1967 (C.D. Cal. Feb. 2, 2016) (order) ................................. 18

*CFPB v. Morgan Drexen*, 60 F. Supp. 3d 1082 (C.D. Cal. 2014)................................................. 20

*Delaware Watch Co. v. FTC,* 332 F.2d 745 (2d Cir. 1964)........................................................ 21

*FTC v. A1 DOCPREP*, No. 17-cv-07044 (C.D. Cal. Sept. 28, 2017).................................... 19, 24

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)...................................... 16, 20, 23

*FTC v. Alliance Document Prep.*, No. 17-7048 (C.D. Cal. Nov. 2, 2017)............................ 16, 24

*FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994).............................. 23

*FTC v. Am. Student Loan Consolidators*, No. 17-cv-61862 (S.D. Fla. Sept. 26, 2017).............. 19

*FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989)............................................ 15, 22

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006).............................................. 16, 18

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993)............................................................. 17

*FTC v. Gill*, 71 F. Supp. 2d 1030, 1043 (C.D. Cal. 1999) ......................................................... 17

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) .................................................... 15, 16

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012)...................... 21

*FTC v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015) ............................................................. 18

*FTC v. M&T Fin. Grp.*, No. 17-cv-06855 (C.D. Cal. Sept. 19, 2017)....................................... 19

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) .......................................... 22

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)........................................................ 15, 17

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 924 (9th Cir. 1997))..................................... 22, 23

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982) ............................................... 20

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)...................................................................... 23

*FTC v. Student Debt Doctor LLC*, No. 17-cv-61937 (S.D. Fla. Oct. 3, 2017) ........................... 19

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000) ................................ 21

*FTC v. U.S. Oil & Gas*, 748 F.2d 1431 (11th Cir. 1984)........................................................... 24

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984).............................................. 20

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) .............................. 15, 16, 20, 21

*In re Cliffdale Assocs.*, 103 F.T.C. 110 (1984) ...................................................... 16, 17

*In re Pfizer, Inc.*, 81 F.T.C. 23 (1972) ...................................................................... 16

*Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)............................................... 17

*New Mexico ex rel. King v. CreditArbitrators, LLC*, No. CV 12-16, 2014 WL 12581756 (D.N.M.

    Mar. 26, 2014)..................................................................................................... 19

*SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir. 1963) ................................................... 24

*Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137 ............................................................ 16

*Southwest Sunsites, Inc.*, 105 F.T.C. 7 (1985) .......................................................... 17

*Thompson Medical Co.*, 104 F.T.C. 648 (1984) ....................................................... 16

*U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987) .................... 16

**Statutes**

15 U.S.C. § 45 ............................................................................................................ 1

15 U.S.C. § 45(a), ................................................................................................. 2, 16

15 U.S.C. § 53(b) ...................................................................................................... 15

15 U.S.C. §§ 41-58 ..................................................................................................... 2

16 C.F.R. § 310 ........................................................................................................... 1

16 C.F.R. § 310.4 ...................................................................................................... 19

16 C.F.R. § 310.6(5) .................................................................................................. 18

16 C.F.R. §§ 310.2 ..................................................................................................... 18

Federal Rules of Civil Procedure R. 65 ..................................................................... 15

## I. NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 9, 2018 at 1:00 p.m., or as soon thereafter as the matter can be heard, in the courtroom of U.S. District Judge Saundra Brown Armstrong of the Northern District of California, 1301 Clay Street, Oakland, California, the Federal Trade Commission ("FTC" or "Commission") will respectfully move the Court for an order granting a preliminary injunction against Defendants to stop continuing violations of Section 5 of the FTC Act, 15 U.S.C. § 45, and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310.

To protect consumers from additional harm and preserve assets for eventual restitution to victims, the FTC asks this court to issue a preliminary injunction including appointment of a temporary receiver. A neutral receiver would prevent further harm to consumers and would locate and secure assets and records without disrupting any legitimate business activity.

## II. INTRODUCTION

The FTC seeks a preliminary injunction to halt a deceptive debt relief operation that has bilked consumers out of millions of dollars. Since 2014, Defendants have operated a sprawling student loan debt relief enterprise. Defendants misrepresent the cost and features of federal student loan repayment and forgiveness programs in order to extract fees from the very struggling consumers these programs are designed to help. To lure consumers, Defendants send mailers claiming consumers are eligible for federal programs that would permanently reduce their monthly loan payments or result in "total loan forgiveness." Defendants charge consumers an advance fee of between $600 and $800 purportedly to enroll them in these federal programs. In addition to charging illegal advance fees, Defendants collect and retain monthly fees that consumers believe are being applied to pay down their loans. Consumers often only discover that the fees did not go to paying off their loans, but instead went directly to Defendants, when they receive a past due notice from their loan servicer. In many instances, not only has their loan balance not diminished, but it has also accrued interest.

Over 300 consumers nationwide have complained about Defendants to government agencies, their loan servicer, and the Better Business Bureau ("BBB"). Complaining consumers consistently report the same deceptive practices alleged by the FTC in this case.

Along with this Memorandum, the FTC is submitting overwhelming evidence of Defendants' scheme. This evidence includes, among other things: hundreds of consumer complaints;[1] statements from Defendants' former employees that the company is a "scam";[2] recordings and transcripts of consumer calls and undercover calls by government investigators that capture Defendants' misrepresentations; declarations from consumers victimized by Defendants; a declaration from a servicer of federal loans that has received dozens of complaints about Defendants; a declaration from the BBB about the complaints it has received about Defendants and its investigation into Defendants' conduct; hundreds of consumer complaints about Defendants filed with the BBB, the FTC, or other government agencies; and financial records indicating that Defendants have dissipated their assets, and are likely to continue doing so unless the Court grants the requested relief.

## III.    THE PARTIES

### A.    Plaintiff

Plaintiff FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC's responsibilities include enforcing the FTC Act's prohibitions on unfair or deceptive conduct, 15 U.S.C. § 45(a), as well as enforcing the Rules it has promulgated under its rulemaking authority, including the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310.

### B.    Defendants

Defendants **American Financial Benefits Center** ("AFBC"),[3] **AmeriTech Financial**

---

[1] Ortiz Att. EE-GG; Stiner Att. A; Lee Att. A-B. Throughout this document, declarations are cited to by the last name of the declarant and the paragraph of the declaration referenced (*i.e.*, Ortiz ¶ 1). Attachments to declarations are cited to by the declarant's last name and reference to the specific attachment (*i.e.*, Ortiz Att. A).

[2] Dowdell Att. A-2 ("The company knows they are scamming people"); Stiner Att. L-11 ("It's a giant scam"); Stiner Att. J ("They have clients all over that they are scamming"); Hamilton ¶ 16 ("they were running a scam"); Bufano ¶ 14 ("AFBC and AmeriTech are shady companies. They scam people by making it seem like clients' monthly payments are going towards their student loans, when in fact all the funds go to the company."); Martinez ¶ 14; *see also* Ortiz Att. HHH.

[3] AFBC was incorporated in California in February 2011. Ortiz Att. A. AFBC has also done business as "AFB" and "AF Student Services." Rhode ¶¶ 5-6, Atts. C-D.

("AmeriTech"),[4] and **Financial Education Benefits Center** ("FEBC")[5] are California corporations holding themselves out as doing business in this district.[6] As described below in Section VI.A, AFBC, AmeriTech, and FEBC (collectively "Corporate Defendants") operate as a common enterprise to defraud consumers with their student loan debt relief scheme. Together, Corporate Defendants have collected over $28 million from their 22,000 customers.[7]

Individual Defendant **Brandon Demond Frere** ("Frere") owns and operates the Corporate Defendants.[8] Frere resides in this district and, in connection with this matter, transacts or has transacted business in this district.[9] As explained below in Section VI.B, Frere is individually liable for the Corporate Defendants' actions.

## IV. DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

Defendants capitalize on the financial hardship of many student loan borrowers. Defendants induce consumers to enroll in, and pay money for, their "student debt relief" program using a combination of lies, false promises, and calculated omissions. Defendants make false or unsubstantiated claims: (1) that consumers qualify for plans that will permanently lower their monthly loan payments and/or lead to loan forgiveness; and (2) that consumers' monthly payments to Defendants will be applied towards consumers' loans. Defendants also require consumers to provide advance payment for work to be performed relating to consumers' student loan debts, in violation of the TSR.

Defendants tout themselves as experts in student loan debt relief,[10] and consumers rely on this expertise when enrolling with Defendants.[11] Targeting consumers who are "unfamiliar or

---

[4] AmeriTech was incorporated in California in October 2015. Ortiz Att. D.

[5] FEBC was incorporated in California in October 2015. Ortiz Att. G.

[6] Ortiz ¶¶ 6, 8-9, 11-12, Atts. A-B, D-E, G-H.

[7] Ortiz Att. GGG at 2; George ¶ 8. This likely underestimates the fees Defendants have collected from consumers. The FTC has not obtained banking records for FEBC. Defendants have stated that FEBC's finances are kept "completely separate" from those of AmeriTech. Ortiz Att. CCC ¶ 21. If this is accurate, FEBC likely collected funds not included in the $28 million figure.

[8] Ortiz Atts. A-B, D-E, G-H, EEE at 2-3 (Frere is the only owner with more than a 5% interest in each AFBC, AmeriTech, and FEBC.); *see infra*, Section VI.B.

[9] Ortiz Att. B (listing Brandon Frere's address as 925 Lakeville St., #175, Petaluma, CA 94952).

[10] Ortiz Att. EEE at 7 ("The Companies are experts in understanding the student loan programs for which their customers are enrolled."); Vildasol ¶ 5. Defendants refer to their employees as

frustrated" with the process and who "don't have the time or knowledge to understand what is available to them,"[12] Defendants convince consumers to pay hundreds or thousands of dollars in fees. Defendants have failed to deliver the desired student loan relief to at least half of their customers,[13] and some report that Defendants performed no work at all.[14] According to a former employee, when the company changed its name to AmeriTech, a manager instructed employees to "stop working on AFBC client files and to focus on AmeriTech clients because they were paying more."[15]

### A. Defendants Falsely Promise Fixed Monthly Loan Payments, Loan Forgiveness, and Eligibility for Government Programs

In pitching their "program" to consumers, Defendants misrepresent both the nature of federal loan repayment programs *and* that consumers are eligible for the programs. The Department of Education ("ED") offers income-driven repayment ("IDR") programs that allow eligible borrowers to limit their monthly payments to a percentage of their discretionary monthly income.[16] Some government programs provide loan forgiveness after the eligible borrower makes a specific number of qualifying payments.[17] Consumers can apply for and enroll in IDR and loan forgiveness programs through ED or their student loan servicers at no cost.[18]

---

"underwriters" and "account specialists," creating the impression that they are student loan specialists. Stiner Atts. BB at 11:6-8, CC at 10:17-21; Gonzalez Att. B at 6:17-19, 12:9-11, 32:2-4. Defendants also claim to be "100 percent compliant with the Department of Education." Ortiz Att. U at 4:11-13.

[11] Vildasol ¶ 5; Carbonneau ¶ 4.

[12] Ortiz Att. DDD, Ex. A at 2.

[13] Out of Defendants' estimated 22,000 clients, approximately 11,000 are in forbearance and have not been accepted in a federal loan assistance program. Ortiz Att. GGG at 2; *see, e.g.*, Archibald ¶ 13; Bowles ¶¶ 12-14, 20; Carbonneau ¶ 9; Vildasol ¶¶ 10-11. *See also* Bufano ¶ 12 (Former employee explained that "There were not enough people in the Operations Department to handle all the client files and applications. As a result, AFBC left many client loans in forbearance while working on their loan payment reduction applications. Many people paid AFBC money and the company did nothing for them.").

[14] Emerson ¶¶ 14-16, 19; Olds ¶ 5; Sills ¶¶ 4, 7.

[15] Bufano ¶ 12.

[16] *See* https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[17] *Id.*

[18] *Id.*; Lee ¶ 3.

It is not possible to promise specific loan forgiveness or to guarantee consumers a fixed monthly payment amount for more than one year.[19]  Income and family size affect monthly loan payment amounts and IDR program eligibility, and the borrower must certify these details annually.[20]  However, in order to entice consumers to enroll and pay their fees, Defendants ignore the strict requirements of the government loan programs and guarantee consumers a set monthly loan payment amount and/or that they will obtain loan forgiveness.[21]

### 1. Defendants' Mailers Falsely Promise Student Loan Payment Reduction and Loan Forgiveness

Starting with the first contact, Defendants misrepresent the features of IDR programs and consumers' eligibility for these programs.  Defendants initiate contact through letters that invite consumers to contact Defendants for "student loan payment reduction and forgiveness."[22]  The mailers have advertised that the addressee is "pre-qualified" or "eligible" for a time-sensitive[23] loan reduction and/or forgiveness program.[24]  Defendants have even included a specific dollar amount listing the savings the consumer could expect.[25]  These communications have not identified Defendants by name, rather, they are signed from the "Student Loan Department."[26]

### 2. Defendants' Sales Calls Reinforce False Promises

Defendants continue to misrepresent the nature of the IDR programs when consumers

---

[19] Lee ¶¶ 6-7.  Defendants acknowledge that they cannot promise that student loan balances will be reduced.  Ortiz Att. DDD, Ex. A at 11-12.  Defendants also acknowledge that they cannot track and do not know the number of clients enrolled in loan forgiveness.  Ortiz Att. GGG at 2.

[20] Lee ¶¶ 6-7.

[21] Lee ¶¶ 6-7, Atts. A-B; Ortiz ¶ 48(b), Atts. U at 4:14-16 ("We can significantly reduce your -- you know, or give you loan forgiveness and, you know, get you back on track."), EE, FF, JJ at 14:13-15:6 ("So a ten-year program total payment is $79,852.80.  That's a savings of $136,147.20."); Stahl Att. H at 19:15-19; Archibald ¶ 4; Bowles ¶¶ 4-5; Carbonneau ¶ 5; Davis ¶ 3; Marshall ¶ 4; Olds ¶ 3; Sills ¶ 3; Vildasol ¶¶ 4, 7; *see generally* Stiner Att. A.

[22] Ortiz Att. S; Marshall ¶ 3; Davis ¶ 3; Emerson ¶ 3; Stiner Atts. F, G at 3-4, H at 4-6, QQ; Rhode Att. D.

[23] Stiner Atts. QQ ("Failure to respond to this letter may void company offer for services."), H at 4 (same), T at 5-6 ("FINAL NOTICE"; "FAILURE TO RESPOND TO THIS NOTICE COULD CANCEL THIS OFFER").

[24] Rhode Att. D at 9-10; Stiner Atts. H at 4, QQ.

[25] Rhode Att. D at 9-10.

[26] Stiner Atts. F, G at 3-4, H at 4, QQ.

call the number listed on the mailer and reach Defendants' sales team.  While describing their services, Defendants' agents assure consumers that they are eligible for "the program" and for a payment plan that will allow them to pay lowered fixed monthly student loan payments for a fixed time period.[27]  Defendants also hide their fee structure during their sales calls.  In describing consumers' payments, they conflate student loan payments and Defendants' fees, referring to these amounts collectively as payments to "the program."[28]  Defendants further confuse consumers about the government IDR programs and Defendants' role by providing other false information.[29]  Defendants promise that, after the consumer makes a set number of monthly payments to "the program," their loan balance will be reduced or eliminated.[30]  For example, in one recorded call with a consumer, Defendants explained:

> "[F]or the first 11 months, your payment will be [$]207. . . .  And then on the 12th
>
> month, your . . . payment will drop down to $126.81 . . . .  [Y]ou'd only have to

---

[27] Stiner Att. BB at 24:2-8, 47:8-48:18 (describing the payment plan as "total program costs" and confirming that the consumer is eligible for the specific program and payments described); Carbonneau ¶ 5, Att. B; Olds ¶ 3, Att. A; Archibald ¶ 3, Att. A ("[G]ive me a call so we can start helping to reduce your Student Loan payments, or put you on track for total 100% forgiveness. Don't wait!"); Stahl Att. H at 19:15-19.

[28] Ortiz Atts. ZZ at 5:15-22, 7:6-13, 10:11-12:9 (Talking to a consumer who is unemployed and living in a homeless shelter, Defendants tell her that the "program" cost is $82 for 33 months and $69 monthly thereafter.  Defendants do not disclose that any of these monthly costs would go to Defendants as fees.  Defendants tell her, "[Y]ou would have to pay the $82.  These are federal programs, and payments need to be made on time."), XX at 19:15-23:10, 24:18-23, 30:13-32:14 (Defendants describe only "program" costs, referenced as "the Department of Education's program," and do not explain fees involved.  Only when the consumer asks about the "cost to be able to enroll in the program" do Defendants allude to any fees, without giving any specific amounts.), VV at 9:13-10:2, 11:3-6, 11:20-12:8, 15:19-23 (When the consumer repeatedly asked about the nature of the program, Defendants offered only that "our payments could be way lower than the amount that you're paying."); Marshall ¶¶ 13, 15, Att. A; Davis ¶ 5; Stiner Att. DD at 27:6-28:3, 33:9-24, 34:7-25; Gonzalez Att. B at 39:6-15.

[29] Gonzalez Att. B at 32:17-18 ("There is no interest in a federal program."); Ortiz Atts. VV at 14:8-15:16 ("You're not paying your loan off, okay?  You're paying [the loan servicer] . . . to do nothing for you at this time. . . .  That's not going towards your loan."), XX at 24:16-17.

[30] Ortiz Atts. TT at 6:24-7:18, 14:1-15, 14:25-15:7 ("I was told when I signed up for this program . . . a year and a half ago after I worked for a government agency for a year that my loans would be forgiven. . . .  [I]t's all bait-and-switch . . . ."), U, JJ at 14:13-15:6, XX at 25:5-16; Stiner Atts. BB at 24:2-8, DD at 11:17-25, 22:2-12, I; Archibald ¶ 4; Lee ¶ 7, Atts. A-B; Carbonneau ¶ 5, Att. B; Davis ¶ 3; Marshall ¶ 4; Vildasol ¶ 4; Gonzalez Att. B at 55:14-56:6.

pay into the program for . . . ten years for 120 payments . . . . [A]t the end of your

term, the ten-year period, $[redacted] is the amount that's going to be forgiven."[31]

These claims are false. As explained above, it is impossible to guarantee a certain student loan

payment or loan forgiveness amount. Even in instances where consumers are aware that they

may enroll in the ED programs free of charge directly through their loan servicers, Defendants

discourage them from doing so by significantly overstating the difficulty of the application process.[32]

### 3. Defendants Misrepresent Consumers' Eligibility for IDR Programs

Defendants also misrepresent consumers' eligibility for IDR programs and for the low

quoted monthly payment rates. Factors such as income and family size dictate whether a

borrower qualifies for an IDR plan.[33] Regulations limit those included in "family size" to a

borrower's spouse, children who receive more than half of their support from the borrower, and

other people who both live with and receive more than half of their support from the borrower.[34]

Under an IDR program, a higher family size will likely lower a borrower's monthly payment.[35]

Defendants manipulate consumers into unknowingly providing a higher family size in

their IDR program applications than what is appropriate.[36] As a former employee explained,

some sales representatives enrolled clients by "aggressively inflating family size figures."[37]

During sales calls, Defendants convince consumers that "family size," for the purpose of

applying to IDR programs, includes *anyone* to whom the consumer provides *any* support.[38]

---

[31] Stiner Att. BB at 23:3-24:8.

[32] Ortiz Att. VV at 13:2-21, 14:8-25; Stahl Att. H at 21:6-18; Gonzalez Att. B at 45:6-10.

[33] Lee ¶ 7.

[34] 34 C.F.R. § 682.215(a)(3).

[35] Lee ¶ 6; Ortiz Att. LL at 11:9-12, 18:2-15; Gonzalez Att. B at 26:15-20, 29:23-25.

[36] Hamilton ¶¶ 10-11, Att. A at 6 (former employee produced a matrix that AmeriTech used to determine the family size necessary to qualify for a $0 loan payment. For example, if a client earned $86,000, the chart recommended a family size of thirteen); Stiner Att. L at L-18:4-19:5; Ortiz Att. XX at 9:13-10:23, 12:18 -13:21 ("[I]t really is just an arbitrary number that you're providing of the people that you're helping support . . . ."); Martinez ¶¶8-9.

[37] Hamilton ¶ 10.

[38] Ortiz Atts. LL at 11:9-14:10, 19:1-20:20, 25:2-6 (Sales agent: "So, like, for example, I'm a -- a dad with a daughter. You'd think it would just be two people, but if I went through and said, you know, who I actually support in my family, with bills or, you know, other ways of support, driving people places or -- now, actually, probably it's more close to eight people in my life

According to Defendants, a grandchild that a consumer babysits can count towards "family size."[39]  So can a niece to whom a consumer simply gave a Christmas gift.[40]  Defendants told one consumer:

> "[S]upport includes any kind of money, gifts, loans, housing, food, clothing, car, medical or dental, payment of college costs.  Do you help anybody -- if you have somebody on your cell phone plan; if you have somebody on your gym membership, they're considered part of your family.  And we just had Christmas. You know, if you bought presents, clothes, watch, earrings, toilet paper, they're a part of your family."[41]

Defendants reassure skeptical consumers that although this definition of "family size" "feels crazy," "it's different than the IRS" and it is appropriate to include people for whom a consumer provides only minimal support.[42]

Consumers trust Defendants' "expert" advice and allow Defendants to apply for IDR programs on their behalf using inflated family size information.[43]  The higher family size generates an artificially low monthly payment for the consumer under an IDR program.[44]  A consumer may begin making payments under an IDR plan and only later learn that he or she did not actually qualify for the particular forgiveness plan or payment rate.[45]  This can significantly set back the consumer's repayment of the student loans and potentially expose a consumer to additional liability.[46]

---

under this definition, so it's a . . . little bit different."), JJ at 12:15-13:1; Stiner Att. DD at 18:12-20; Carbonneau ¶ 4;Vildasol ¶ 5; Martinez ¶¶ 8-9 (AmeriTech managers told employees to tell consumers that "[a] close friend that uses your Netflix account" constituted a family member.)
[39] Vildasol ¶ 5.
[40] Ortiz Att. LL at 19:19-20: 9; Stiner Att. DD at 21:4-13.
[41] Stiner Att. DD at 20:6-14.
[42] Ortiz Att. LL at 13:23-14:10.
[43] Vildasol ¶ 5; Carbonneau ¶ 4; Stiner Att. L at L-18:4-24.
[44] Ortiz Att. LL at 11:9-12.
[45] Vildasol ¶ 10.
[46] *Id.*

### B. Defendants Mislead Consumers to Extract Monthly Charges and Illegal Advance Fees

Defendants collect two types of fees from consumers: (1) illegal advance fees, and (2) monthly fees that they mislead consumers into believing are their new loan payments, but that actually pay for a "financial education" membership program.

#### 1. Illegal Advance Fees

Defendants typically charge consumers two types of advance fees. One upfront fee purportedly pays for Defendants' document preparation services, and generally has ranged between $600 and $800.[47] Defendants claim that the other advance fee enrolls consumers in Defendants' "financial education" membership program, and have charged consumers from around $100 to $1,200.[48] Defendants collect payment information for both advance fees during the initial telemarketing call with consumers.[49] Consumers pay all or a portion of the advance fee almost immediately, often long before consumers are enrolled in an IDR program.[50] Defendants lead consumers to believe that Defendants will apply all or a portion of these advance payments to repay their student loans.[51]

Since late 2015, Defendants have attempted to circumvent the requirements of the TSR, which prohibits sellers and telemarketers from requesting or receiving payment of any fees prior

---

[47] Archibald Att. B at 14 ($800 fee); Bowles Att. B at 8 ($600 fee); Carbonneau Att. A at 2 (same); Emerson Att. A at 6 (same); Marshall Att. A at 2 (same); Vildasol Att. A at 12 (same).

[48] Archibald Att. B at 22 ($100 fee); Emerson Att. A at 11-12 ($695 fee, including set-up fee); Bowles Att. B at 14 ($1295 fee); Marshall Att. A at 7 (same); Vildasol Att. A at 1 (same).

[49] Emerson ¶ 10; Stiner Atts. BB at 52:9-22, CC at 17:17-18:12, DD at 42:6-11.

[50] Archibald ¶¶ 7, 9-11, 13 (consumer signed up on 1/8/16; first payment was deducted on 2/5/16; forbearance notice received on 6/9/17; IDR adjustment received on 7/4/17); Bowles ¶¶ 9-10, 20 (consumer signed up on 1/22/15; first payment was deducted in early 2015; in May 2015, consumer learned that no action had been taken on loan account); Carbonneau ¶¶ 3-7, 9 (consumer signed up on 1/22/15; first payment was deducted on 9/16/15; on 5/25/17, consumer learned loans had been placed in deferment); Marshall ¶¶ 6-8 (consumer signed up on 3/9/15 and first payment was deducted on 4/3/15); Olds ¶¶ 3-5 (consumer signed up on 9/1/16; first payment was withdrawn shortly thereafter; consumer learned in June or July 2017 that her loan "had never been touched"); Vildasol ¶¶ 4, 8, 10 (consumer signed up on 4/3/14; first payment was withdrawn on 5/30/14; consumer learned in Sept. 2015 that his loan was in forbearance and he did not qualify for loan forgiveness).

[51] Carbonneau ¶ 5; Emerson ¶ 10; Olds ¶¶ 4-5; Sills ¶ 2.

to the successful renegotiation or reduction of at least one of the consumer's debts,[52] by placing consumers' advance fees for document preparation services in a dedicated bank account managed by a third party.[53] Defendants claim they will access these funds only once they determine that they have "earned [their] fees,"[54] but have also provided differing information about when they remove the consumers' payments from the dedicated accounts.[55] Defendants do not clearly and conspicuously disclose that their upfront payments for document preparation are being held in a dedicated account, and consumers are unaware that they can retrieve their funds.[56] Nor do Defendants adequately inform consumers that they are enrolled in or paying for the "financial education" membership program.[57] As discussed further below in Section V.C.2, Defendants' use of dedicated accounts does not relieve them of liability under the TSR.

## 2. Deceptive Monthly Charges

After exacting these illegal advance fees, Defendants also charge their financially strapped consumers a monthly "program" fee, usually of between $49 and $99.[58] Defendants represent to consumers that this is their new monthly payment amount and that these payments will be applied each month to their outstanding loan balance.[59] This is false. Defendants collect these fees every month but send no money to pay the consumers' loans.[60]

---

[52] *See infra*, Section V.C.2.
[53] Ortiz Atts. DDD, Ex. A at 5, 8, EEE at 3-4, GGG at 2.
[54] Ortiz Atts. DDD, Ex. A at 5, 8, GGG at 2.
[55] Ortiz Atts. DDD, Ex. A at 12 (Defendants "do[] not collect fees until such time as the consumer is actually accepted into a federal student relief program and makes a payment . . . [e]xcept in cases of forbearances . . . ."), CCC ¶ 21 ("Ameritech nonetheless does not accept any payment for its federal student loan application documentation and processing services until after the customers receive their results."), FFF at 3 ("Ameritech only collects its fees after the company completes and submits the consumer's documents . . . .").
[56] Marshall ¶ 9; Archibald ¶ 7; Stiner Att. CC at 27:22-28:7 (Defendants referred to the escrow company simply as "the company that the program utilizes to manage your payments.").
[57] *See infra*, Section IV.B.2.
[58] Archibald ¶ 4, Att. B at 22, 36; Bowles ¶ 5, Att. B at 17; Marshall ¶ 13, Att. A at 9; Olds ¶ 3; Emerson Att. A at 14; Martinez ¶¶ 5, 11-12.
[59] Marshall ¶¶ 9-15; Emerson ¶ 10; Olds ¶¶ 4-5; Vildasol ¶¶ 7, 9, Att. C; Sills ¶ 2; Stiner Att. BB at 23:3-9; Archibald ¶ 15; Bowles ¶ 5.
[60] George ¶ 30, Att. T; Ortiz Att. EEE at 10.

When pressed, Defendants admit that these monthly fees actually pay for a "financial education" membership program.[61] The "financial education" program includes access to services that are unrelated to consumers' student loans, such as "Key Ring & Luggage Protection," and "Auto Buying Service and Maintenance Discounts."[62]

Many consumers pay for months or years before learning that Defendants are not applying their payments toward their student loans.[63] It is easy to see why consumers are misled. Defendants do not advertise the "financial education" program in their mailers and infrequently mention it in the course of the sales calls.[64] On the rare occasion when Defendants did reference the "financial education" membership, they presented the resource as a complimentary sign-up perk.[65] References to the "financial education" program in Defendants' agreements often are buried in the paperwork.[66]

Defendants also reinforce consumers' understanding that their recurring monthly payments go to pay off their student loans. The duration of the monthly payments is the same as

---

[61] Archibald ¶ 15. Defendants have offered different membership programs over time – they are referred to collectively here as the "financial education" program. Defendants originally offered their "financial education" program as part of enrollment with AFBC. Ortiz Att. EEE at 2-3. At different points, they have called it the "Financial Education and Resource Center Program and AFBC Student Financial Management Plan" (Bowles Att. B at 14) and the "Financial Education Platinum Member Benefits Program and AFBC Financial Success Kit" (Emerson Att. A at 11). Since December 2015, Defendants have offered the "financial education" program through FEBC. Ortiz Att. CCC ¶¶ 7, 19.

[62] Vildasol Att. A at 17.

[63] Archibald ¶¶ 13-16; Bowles ¶ 20; Carbonneau ¶¶ 9-11; Marshall ¶ 13; Olds ¶¶ 5-7; Sills ¶¶ 7-8; Vildasol ¶ 11; Ortiz ¶ 48(A), Atts. EE-HH; Lee ¶¶ 7, 11, Atts. A-B; Ortiz Atts. PP at 5:14-6:15, 8:25-9:13 ("How come I didn't know this and I've been doing this for several years now?"), TT at 4:18-5:25, 7:23-8:1; *see generally* Stiner Att. A; Martinez ¶ 12.

[64] Ortiz Att. S; Stiner Atts. F, QQ, BB at 58:14-19, 74:16-23, 76:13-24 ("financial education" program mentioned in passing during sales call once, and only mentioned again during verification, after consumer signed contract), CC at 36:2-10, 51:15-22, 53:5-15 (same), DD (no mention of "financial education" program); Olds ¶ 3, Att. A (describing the consumer's "quote" as "$255 for 1 month then it would drop down to $235 for an additional 6 months then it will be $99 for the remainder of your loan term"); Stahl Atts. E, F, G (no mention of "financial education" program), H at 18:5-14 (general reference to a "membership" only); Holton Att. B (no mention of "financial education" program); Gonzalez Att. B at 40:1-15 (general reference to a "membership fee" only); Archibald ¶ 15; Bowles ¶ 6.

[65] Stiner Att. BB at 58:14-19; Stiner Att. CC at 36:2-10.

[66] Archibald Att. B at 21-26; Bowles Att. B at 14-16; Emerson Att. A at 11-12, 14.

the remaining term of consumers' loans.[67]  Defendants tell consumers that their "program" is at

will and that consumers may cancel if they "wish go back to [their] standard repayment," giving

the impression that Defendants' monthly fees are linked to consumers' student loans and

necessary to remain enrolled in a government program.[68]  And if a consumer misses a payment

to Defendants, Defendants send correspondence suggesting that the consumer is falling behind

on loan payments.[69]

Nearly all clients enrolled with Defendants' "document preparation" service are also

enrolled in their "financial education" membership program.[70]  However, consumers have stated

that they never would have knowingly paid for such a program "because the whole point of

dealing with AFBC was to reduce the amount of my student loan to an affordable payment," not

to sign up for additional monthly payments.[71]

### C.  Defendants' High-Pressure Tactics Prevent Consumers from Discovering Misrepresentations

After Defendants have convinced consumers to enroll in their program and have obtained

payment information, they rush consumers into electronically signing a lengthy and confusing

agreement.  While on the phone, Defendants email consumers a link to a dense set of documents

for electronic signature.[72]  Defendants quickly run through the contract, falsely representing that

the agreement simply enumerates what Defendants already outlined on the call.[73]  At times,

---

[67] Olds ¶ 3; Stiner Atts. BB at 23:22-24:8, DD at 27:18-28:3; Ortiz Att. LL at 21:4-15; Gonzalez Att. B at 35:14-20.
[68] Stiner Att. CC at 26:7-12; Stahl Att. H at 21:20-22:1.
[69] Vildasol ¶ 12, Att. D ("I told AFBC to stop charging me.  AFBC agreed to cancel my account, but then I received an email from AFBC stating:  'This is our second attempt to resolve your declined payment. . . .  Don't risk falling behind on your payments - ACT NOW!'"); Sills Att. D.
[70] Defendants admit that approximately 90% of customers enrolled with AmeriTech are also paying for "financial education" membership services.  Ortiz Att. GGG at 2.
[71] Bowles ¶ 6; Sills ¶ 8; Archibald ¶ 15.
[72] Marshall ¶ 6, Att. A; Carbonneau ¶ 6, Att. A; Davis ¶ 4; Emerson ¶ 12, Att. A; Vildasol ¶ 6, Att. A; Archibald ¶ 5, Att. B.
[73] Stiner Atts. BB at 53:17-60:8 ("This, again, is just breaking everything down in legal terms."), CC at 25:16-20 ("[Y]ou'll see something called Ameritech Financial Doc Prep and Service Agreement . . . .  And this is going to be the program.  And that page just reiterates the basic information I gathered."); Carbonneau ¶ 6; Davis ¶ 4; Emerson ¶ 12; Vildasol ¶ 6.

Defendants send consumers partially blank forms.[74]  Defendants urge consumers to electronically sign the contract while still on the call.[75]  Many consumers did not have an opportunity to read or understand the agreement, but trusted that Defendants had accurately represented its contents.[76]

After a consumer signs the agreement package, Defendants transfer the consumer to their "Verification Department."[77]  At this point, consumers often have been on the phone with Defendants for close to or over an hour, have already signed the agreement to enroll with Defendants and provided payment information, and are eager to finish the call.[78]  Defendants' verifiers quickly read a script that both asks consumers to confirm personal details and speeds through important legal qualifications and clarifications that conflict with Defendants' earlier misrepresentations.[79]  Defendants' "verifiers" require consumers to answer all questions with either a "yes" or a "no."  If a consumer asks a question, the verifier will transfer the consumer back to the sales agent for an answer before completing the verification process.[80]

In other words, Defendants tell consumers one thing during the sales call, and then pressure them to sign without reading a document that states something completely different. Defendants then hastily try to avoid liability by transferring the consumer to the "Verification Department."

---

[74] Marshall ¶ 8 ("AFBC sent me forms that I signed, scanned, and emailed back to AFBC. Sometimes AFBC sent me forms with information fields left blank."); Davis ¶ 4 ("All the fields on the forms were blank."); Archibald ¶ 5, Att. B; Carbonneau Att. A.

[75] Stiner Att. BB at 60:10-14; Carbonneau ¶ 6; Davis ¶ 4; Emerson ¶ 12; Vildasol ¶ 6.

[76] Marshall ¶ 6; Davis ¶ 4; Archibald ¶ 5; Vildasol ¶ 6.

[77] Ortiz Att. DDD, Ex. A at 4.

[78] Stiner Atts. Y and BB at 61:20 (consumer is transferred to "verification" department after she has electronically signed the agreement and has been on the phone with Defendants for over an hour and twenty minutes), Z and CC at 43:8 (consumers were transferred to "verification" department after they electronically signed the agreement and had been on the phone with Defendants for over 50 minutes), AA and DD (consumer was on the call with Defendants for over an hour when the recording is cut off; consumer had not yet been sent to the "verification" department), BB at 63:2-6, CC at 43:8-10.

[79] Stiner Atts. BB at 63:22-83:18, CC at 43:8-70:8.

[80] Stiner Atts. BB at 63:24- 64:12, CC at 48:9-21; Gonzalez Att. B at 58:16-24.

**D.** **Defendants Cut Off Consumers' Communications with Loan Servicers and the Department of Education to Prevent Discovery of the Scam**

Defendants take numerous steps to prevent or delay consumers from discovering that they have been scammed. Defendants surreptitiously cut off communications between consumers and their loan servicers. Defendants require consumers to turn over highly sensitive information – including Social Security numbers and Federal Student Aid ("FSA") login IDs, passwords, and security questions.[81] Defendants use these details to change consumers' FSA passwords and email contact information so loan-related correspondence goes directly to Defendants, instead of to the consumers, thereby shutting consumers out of their own online student loan accounts.[82] Defendants instruct consumers to cease communications with[83] and payments to their loan servicer.[84] In some instances, Defendants have even misrepresented that they will be the consumer's new loan servicer and that the consumer will be making their monthly payments directly to Defendants.[85]

Defendants often place consumers' loans into forbearance, which also hinders consumers from learning of Defendants' misrepresentations.[86] When a loan is in forbearance, the consumer is not required to make student loan payments, and so the loan servicer may not contact the consumer.[87] Consumers are unaware that their loans are in forbearance and believe their payments to Defendants are going to pay down their loans, and so do not question why Defendants are pulling money from their accounts.[88] Defendants have kept consumers' loans in forbearance for lengthy periods,[89] while the consumers' loans continue to accrue interest.[90]

---

[81] Archibald ¶¶ 8, 12; Bowles ¶¶ 8,18-19; Marshall ¶ 14.
[82] Lee ¶ 13 ("The contact email address for 199 Great Lakes borrowers changed to AFBC.Confirmation@afcenter.com."); Bowles ¶ 20; Marshall ¶ 14; Ortiz Att. PP at 4:15-18, 8:13-19 (consumer does not get monthly bill from loan servicer, but Defendants do).
[83] Marshall ¶ 8; Carbonneau ¶ 5
[84] Stiner Atts. BB at 39:17-25, CC at 34:14-17.
[85] Sills ¶¶ 2, 8.
[86] Lee ¶ 11, Att. A-B; Archibald ¶ 13; Carbonneau ¶ 9; Vildasol ¶ 10.
[87] Lee ¶ 11, Att. A-B.
[88] *Id.*
[89] Archibald ¶¶ 7, 9-13; Bowles ¶¶ 9-10, 20; Carbonneau ¶¶ 3-9; Olds ¶¶ 3-5;Vildasol ¶¶ 4, 8,10.

Months or years after enrolling with Defendants, a consumer may learn that Defendants did not obtain the promised payment reduction and forgiveness, that the consumer's payments went to Defendants instead of toward paying down their loan balances, and that the consumer could have applied for the loan payment programs cited by Defendants for free.[91]  However, Defendants ensure that it is difficult for consumers to discover the truth.  Even when consumers have noticed something awry in their dealings with Defendants, Defendants have continued to misrepresent their services in an attempt to continue to collect fees.[92]

## V.     THE FTC HAS SHOWN A LIKELIHOOD OF SUCCESS AND THE EQUITIES WEIGH IN FAVOR OF THE REQUESTED RELIEF

To stop Defendants' ongoing deceptive practices, Plaintiff respectfully requests the Court to issue a preliminary injunction enjoining future misrepresentations, prohibiting the collection of illegal advance fees; preserving assets and documents, requiring an accounting of Defendants' finances, and appointing a temporary receiver.  Incident to its authority to issue permanent injunctive relief, this Court has the inherent equitable power to grant all preliminary relief necessary to effectuate ultimate relief.  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).

### A.     This Court Has the Authority to Grant the Requested Relief

This Court has the authority to grant preliminary and permanent relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Rule 65 of the Federal Rules of Civil Procedure.  In actions brought under Section 13(b), the district court may exercise the full breadth of its equitable authority, including the imposition of additional relief necessary to accomplish complete justice, such as orders appointing a receiver or requiring restitution to consumers.  *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346-48 (9th Cir. 1989) (affirming district court's

---

[90] *See* https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven; Archibald ¶ 16; Vildasol ¶ 14.
[91] Archibald ¶¶ 13, 15-16; Lee ¶ 3.
[92] Carbonneau ¶ 12 ("At one point, the agent claimed that AFBC actually forwarded all the money they collected as fees to my loan servicer at the end of the ten-year period.").

power to appoint a receiver); *Singer*, 668 F.2d at 1113 (affirming preliminary injunction); *FTC v. Alliance Document Prep.*, No. 17-7048, slip op. at 14 (C.D. Cal. Nov. 2, 2017) (issuing preliminary injunction in matter involving "student loan debt relief services").

### B. Legal Standard for Issuing a Preliminary Injunction

To obtain a preliminary injunction, the FTC must show a likelihood of success on the merits and that the equities weigh in favor of granting the relief requested. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999); *World Wide Factors,* 882 F.2d at 346. Harm to the public is presumed. *Affordable Media*, 179 F. 3d at 1233; *see also United States. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987) (where injunction is authorized by statute, enforcing agency need not show irreparable injury). Further, in weighing the public and private equities in a statutory enforcement action, public equities should receive greater weight. *World Wide Factors*, 882 F.2d at 347; *Affordable Media*, 179 F.3d at 1236. The FTC easily meets this standard in the present case.

### C. The FTC Has Demonstrated a Likelihood of Success on the Merits

#### 1. Defendants' Misrepresentations Violate the FTC Act

Defendants' deceptive representations violate the FTC Act, which prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). An act or practice is deceptive if it is likely to mislead consumers, acting reasonably under the circumstances, in a material respect. *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006). A misrepresentation "is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" *Id.* at 1201 (quoting *In re Cliffdale Assocs.*, 103 F.T.C. 110, 165 (1984)). The Court should consider the overall "net impression" that Defendants' representations make upon consumers, and not merely analyze isolated words and phrases. *See id.* at 1200.[93] Even claims that are not demonstrably false must nonetheless be supported by a reasonable basis. *In re Pfizer, Inc.*, 81 F.T.C. 23 (1972); *see also In re Thompson Medical Co.*, 104 F.T.C. 648, 788 (1984), *aff'd, Thompson Medical Co., Inc. v.*

---

[93] A solicitation "capable of being interpreted in a misleading way" is construed against the maker of the solicitation. *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir. 1978).

*FTC*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987).

Here, Defendants have made repeated material misrepresentations about at least two aspects of their business: (1) that consumers qualify for plans that will permanently lower their monthly loan payments and/or lead to loan forgiveness; and (2) that consumers' monthly payments to Defendants will be applied towards consumers' student loan balances.

The first claim is false or unsubstantiated; the second claim is patently false. As described above in Section IV.A, Defendants cannot guarantee that consumers qualify for loan payment reduction or forgiveness, and Defendants did not make payments to loan servicers on behalf of consumers. Each of these representations violates the FTC Act because it is material, and likely to mislead consumers who were acting reasonably under the circumstances. Reasonable consumers are not required to doubt the veracity of express representations, and the Court may presume express claims to be material. *Pantron I*, 33 F.3d at 1095. Implied claims are presumptively material where there is evidence that the seller intended to make the claim or the claims go to the heart of the solicitation or the characteristics of the product or service offered. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992); *Southwest Sunsites, Inc.*, 105 F.T.C. 7, 149 (1985), *aff'd,* 785 F.2d 1431 (9th Cir. 1986); *see also FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) (law does not protect people who merely imply their deceptive claims). Furthermore, consumers' reliance on such false claims is presumptively reasonable. *Cliffdale Assocs., Inc.*, 103 F.T.C. at 168. Both of these claims are express representations, and in any event go to the heart of the services promised by Defendants.

These misrepresentations also are not cured by the contradictory disclaimer language buried in the "agreement" that Defendants pressure consumers to e-sign at the end of the deceptive sales call.[94] The lengthy document – which consumers are rushed to e-sign only after

---

[94] Not only was this tactic ineffective in alerting consumers, it is also legally impermissible. *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (The FTC Act is violated "if [a company] induces the first contact through deception" despite buyer later obtaining more information.); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimer in a contract that "consumers eventually sign" is insufficient because "the disclaimer is not included in the representations" and "each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information"), *aff'd*, 265 F.3d 944 (9th Cir.

they have already divulged their payment information – contains buried disclaimers and contradictory statements. As the hundreds of complaints from consumers who believed Defendants' misrepresentations demonstrate, Defendants' late disclaimers are ineffective.[95] *See Cyberspace.com*, 453 F. 3d at 1201 (Proof that representation actually deceived consumers is "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.").

Thus the FTC is likely to prevail in showing that each of these misrepresentations is false or was unsubstantiated at the time it was made.

### 2. Defendants' Misrepresentations and Upfront Fees Violate the TSR

Defendants are subject to the TSR. The TSR prohibits abusive and deceptive telemarketing, and expressly applies to sellers or telemarketers of "debt relief services," defined as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter" debt between a consumer and unsecured creditors, including "a reduction in the balance, interest rate, or fees."[96] Defendants receive inbound calls in response to a direct mail solicitation, meaning they qualify as "telemarketers" and "sellers." *See* 16 C.F.R. § 310.6(5). Student loan debt relief services are considered "debt relief services" for the purposes of the TSR. *See CFPB v. Irvine Webworks*, No. 14-1967, slip op. at *12-13 (C.D. Cal. Feb. 2, 2016) (order) ("[T]he comments made by the FTC in the promulgation of the Telemarketing Sales Rule confirm the intent for the Telemarketing Sales Rule to cover entities that engage in practices substantially similar to those of loan consolidation middlemen."); *FTC v. A1 DOCPREP*, No. 17-

---

2001); *see also FTC v. Johnson*, 96 F. Supp. 3d 1110, 1139 (D. Nev. 2015) (Fine print disclosures offered after the consumer had started the ordering process did not alter the misleading net impression created by the solicitation.).

[95] Ortiz ¶ 48, Atts. EE-HH; Stiner Att. A.

[96] 16 C.F.R. §§ 310.2(dd), (ff), (o). The TSR applies to any "seller" or "telemarketer" selling goods or services by use of one or more telephones via interstate telephone calls. 16 C.F.R. §§ 310.2(dd), (ff), (gg). A "telemarketer" means any person who, in connection with telemarketing, *initiates or receives* telephone calls to or from a customer. 16 C.F.R. § 310.2(ff). "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

cv-07044 (C.D. Cal. Sept. 28, 2017) (order) granting TRO and finding likely violation of the TSR's advance fee ban); *FTC v. M&T Fin. Grp.*, No. 17-cv-06855 (C.D. Cal. Sept. 19, 2017) (same); *FTC v. Student Debt Doctor LLC*, No. 17-cv-61937 (S.D. Fla. Oct. 3, 2017) (same); *FTC v. Am. Student Loan Consolidators*, No. 17-cv-61862 (S.D. Fla. Sept. 26, 2017) (same).

Defendants violate two provisions of the TSR. First, the TSR prohibits debt relief sellers or telemarketers from misrepresenting any material aspect of their services. 16 C.F.R. §§ 310.3 (a)(2)(vii), (x). Defendants misrepresent at least two material aspects of their services.[97]

Second, Defendants violate the TSR's provision that prohibits sellers and telemarketers from requesting or receiving payment of any fees prior to the successful renegotiation or reduction of at least one of the consumer's debts, *and* prior to the consumer making at least one payment pursuant to such reduction. *See* 16 C.F.R. § 310.4(a)(5)(i). Defendants require consumers to pay advance fees shortly after the first telemarketing call and before Defendants have even submitted enrollment paperwork to ED on behalf of the consumers.

Defendants contend that they comply with the advance-fee prohibition in the TSR because they keep consumer funds in dedicated bank accounts until they complete their work on a consumer's loans.[98] This argument fails for several reasons. First, Defendants did not use dedicated accounts for at least their first two years of operation.[99] Defendants cannot claim the dedicated account system as a defense for that earlier period. Second, Defendants fail to disclose adequately the existence of the dedicated accounts and the consumers' right to withdraw funds. The TSR requires clear and conspicuous disclosure of the existence of a dedicated account, and other additional information about it. 16 C.F.R. § 310.3(a)(1)(viii)(D); *see New Mexico ex rel. King v. CreditArbitrators, LLC*, No. CV 12-16, 2014 WL 12581756 (D.N.M. Mar. 26, 2014) (interpreting this disclosure requirement strictly and mandating clear and conspicuous disclosures for each sub-provision). Third, Defendants have stated that they withdrew funds from consumers' accounts even though the consumers were not yet enrolled in the promised

---

[97] *See supra*, Section IV.
[98] Ortiz Att. CCC ¶¶ 21-22.
[99] Ortiz Att. GGG at 2 (Defendants began using dedicated bank accounts (or "escrow accounts") in "late 2015.").

federal loan assistance program.[100]  Finally, Defendants try to avoid the TSR's requirements and collect fees upfront by funneling many of the fees to FEBC, and claiming that this program does not offer debt relief services.[101]  Courts have rejected this tactic.  *See CFPB v. Morgan Drexen*, 60 F. Supp. 3d 1082, 1093-94 (C.D. Cal. 2014), *rev'd on other grounds*, 671 Fed. Appx. 954 (9th Cir. 2016).  In fact, the recent separation of AmeriTech (offering "document preparation" services) and FEBC (offering a membership to a "financial education" membership program) from AFBC is a sham, as described below in Section VI.A.

### D.    The Equities Favor Granting the Preliminary Injunction

As discussed above, once the FTC establishes the likelihood of its ultimate success, preliminary relief is appropriate if the Court finds that the equities weigh in favor of granting the relief sought.  In weighing the equities, the Ninth Circuit has held that the public interest should receive far greater weight than the private interests.  *Affordable Media*, 179 F.3d at 1236 (quoting *World Wide Factors*, 882 F.2d at 347); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984).  The equities in this case weigh heavily in favor of preliminary injunctive relief.  Defendants' conduct has led many consumers to spend considerable money – and even to acquire further student loan debt[102] – under the false belief that they were guaranteed lower payments and/or loan forgiveness and that Defendants were forwarding payments to pay down the consumers' student loans.  In fact, Defendants cannot promise permanent loan reduction and forgiveness, many consumers do not qualify for the loan programs, and Defendants retained all of the consumers' payments.  Given the pervasive nature of the unlawful activity, there is a strong likelihood that, absent injunctive relief, future law violations will occur.  *See FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982) (Injunctive relief is appropriate where evidence suggests "a large-scale systematic scheme tainted by fraudulent and deceptive

---

[100] *See supra*, note 55.

[101] Ortiz Att. CCC ¶¶ 21-22.  It is also noteworthy that the documents provided to consumers from the company that manages the dedicated accounts, such as the application forms and account updates, are incredibly confusing.  It would be nearly impossible for a consumer to divine the purpose of the different charges.  Archibald Att. B at 36.

[102] Vildasol ¶ 10 ("I continued to receive delinquency notices from my lender in 2014 and 2015.  On one notice, I realized my loan balance had not decreased but actually increased.").

practices, giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint."). These violations, if continued, will result in additional consumer loss.

The private equities in this case are not compelling. There is no oppressive hardship to Defendants in requiring them to comply with the law and refrain from fraudulent representations. *See World Wide Factors*, 882 F.2d at 347. The FTC acknowledges that requesting appointment of a temporary receiver is a serious remedy. However, if the receiver finds that Defendants' business can be run lawfully, a receiver will allow it to continue to do so. If not, then Defendants have no private interest in an unlawful operation. The evidence demonstrates that the public equities – the protection of innocent consumers from fraud and the effective enforcement of the law – weigh heavily in favor of granting the preliminary relief requested in this case.

## VI. THE LIABILITY OF DEFENDANTS

### A. Corporate Defendants Are Liable as a Common Enterprise

Corporate Defendants operate as a common enterprise and are jointly and severally liable. "Where one or more corporate entities operate in a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd*, 312 F.3d 259 (7th Cir. 2002); *see FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (quoting *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964)).

Corporate Defendants engage in the same student loan debt relief scheme to defraud consumers. Defendants conduct business through an interrelated network of companies that, as described below in Section VI.B, are commonly owned and managed by Frere. Defendants have openly acknowledged an intertwined relationship.[103] Defendants admit that AFBC divided into AmeriTech and FEBC in order to take advantage of a perceived legal loophole, and have since essentially shuttered the operations of AFBC.[104] Defendants AFBC and AmeriTech market,

---

[103] Gonzalez Att. B at 49:2-4 ("American Financial Benefits Center program is a subsidiary of Ameritech Financial. We're one and the same."); Stiner ¶ 28, Att. M (Ameritech submitted paperwork describing Ameritech as a "branch Location" or "child" of AFBC).
[104] Ortiz Att. CCC ¶¶ 21-22.

offer for sale, and sell the same products or services.[105]  AmeriTech and FEBC sell their services together and provide service contracts simultaneously to consumers.[106]  Corporate Defendants have common employees[107] and share work facilities.[108]  Bank records obtained through Commission Civil Investigative Demands show consistent, substantial payments between the AmeriTech and AFBC accounts.[109]

### B.    Defendant Frere Is Liable for Monetary and Injunctive Relief

Defendant Frere is individually responsible for the illegal activity of the corporations he controls and may be subject to injunctive and monetary relief for violations the corporations have committed.  To establish individual liability for injunctive relief, the FTC must show that the individual participated directly in the violative acts or practices or had authority to control them. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1138 n.9 (9th Cir. 2010) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 924, 1170 (9th Cir. 1997)).  Authority to control can arise from assuming the duties of a corporate officer, particularly when the corporate defendant is a small, closely held corporation.  *Amy Travel*, 875 F.2d at 573-74; *Publ'g Clearing House,* 104 F.3d at 1170-71.

Defendant Frere is liable for injunctive relief based on his participation in the scheme. He is the founder, CEO, Secretary, CFO, and sole Director of each of the closely held Corporate Defendants [110] and is a signatory on AFBC's and AmeriTech's depository bank accounts.[111]  He unquestionably controlled, participated in, and was aware of their practices.

An individual subject to injunctive liability is further liable for monetary redress for corporate practices if the individual knew or should have known of the practices.  *FTC v.*

---

[105] *Id.* ¶¶ 5-7.
[106] Marshall Att. A at 2-9, 19; Vildasol Att. A at 1-3, 12, 17-22; Emerson Att. A at 6,11-18; Stiner Atts. BB at 58:14-19, CC at 36:12-18.
[107] Ortiz ¶ 28, Att. V (showing at least 66 employees who were employed by AFBC and then shortly thereafter by AmeriTech).
[108] Ortiz Att. EEE at 3 ("FEBC, like AFBC, has executives and employees that spend most of their time at the Ameritech's [sic] facilities in Rohnert Park.")
[109] George ¶ 9 (identifying $2.485 million in transfers from AFBC to Ameritech); Ortiz Att. T.
[110] Ortiz ¶¶ 6-14, Atts. A- B, D-E, G-H, III-1; Stiner ¶ 30.
[111] Ortiz Att. Y.

*Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009). Knowledge in this context is defined as actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of a misrepresentation, or an awareness of a high probability of fraud along with an intentional avoidance of the truth. *Affordable Media*, 179 F.3d at 1234; *Publ'g Clearing House*, 104 F.3d at 1171 (citing *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). The FTC does not need to show intent to defraud. *Affordable Media*, 179 F.3d at 1234. The extent of an individual's involvement in a fraudulent scheme alone is probative of and sufficient to establish the requisite knowledge. *Id.* at 1235; *Amy Travel*, 875 F.2d at 573.

Frere is liable for monetary relief based on his actual knowledge of the wrongdoing. Frere manages day-to-day operations of Corporate Defendants and signs contracts on behalf of Defendants.[112] Frere is fully aware of Defendants' unlawful practices, having received numerous complaints from the BBB.[113]

Frere also appears to operate the AmeriTech and AFBC bank accounts as his personal fund. There is reason to believe that Frere transferred over $3.164 million from Corporate Defendants' accounts to his personal account.[114] Corporate Defendants' accounts further show dissipation of over $128,000 to airlines, hotels, resorts, casinos, cruise lines, and similar companies;[115] over $202,000 to automotive and motorsports companies;[116] and over $253,000 to companies that provide building, landscaping, and related supplies and services that appear

---

[112] Stiner ¶¶ 29-33, 25, 27, 51-53, 55-57, Atts. N, O, R, T, HH, JJ, KK (Frere represented AmeriTech in meetings and correspondence with the BBB.); Bowles Att. B at 22 (Frere is the signatory on the contract and is listed as "Managing Director" of AFBC.); Ortiz Atts. DDD, Ex. A at 2-3 (Frere "actively participates and focuses on clear communications with consumers to set expectations properly."), K (identifies Brandon Frere as "admin" for afbcenter.com website), N (identifies Brandon Frere as "admin" for ameritechfinancial.com website).
[113] Stiner ¶¶ 29-33, 35, 51-53, 55-56, 63, Atts. N, O, R, T, HH, JJ, KK.
[114] Corporate Defendants' bank accounts transferred over $3.164 million to a particular Bank of America account. George ¶ 26, Att. P. FinCEN reports identify Frere as withdrawing funds from a Bank of America account, which had an account number ending in the same four numbers as the account referenced in the first sentence of this footnote, and as conducting the transaction on his own behalf. Ortiz ¶¶ 33-38, Atts. Z, AA-BB.
[115] George ¶ 15, Att. H.
[116] *Id.* ¶ 16, Att. I.

unrelated to the operation of Defendants' business.[117]  Frere directed payments of over $864,000

that appear to go to his family members or family-owned businesses.[118]

## VII.    A PRELIMINARY INJUNCTION WITH EQUITABLE RELIEF IS NECESSARY

### A.    Preliminary Injunction

The proposed injunction will benefit the public by preventing further harm and requiring

Defendants to follow the law.  Absent an injunction, Defendants will likely continue to deceive

the public.  Section I of the proposed Order would bar Defendants from continuing to collect

illegal advance fees.  This will help stop ongoing consumer injury, and has been granted in a

recent FTC case involving similar conduct.  *Alliance Document Prep.*, No. 17-7048, slip op. at

12-14.  Section II would require them to cease deceptive marketing that violates the FTC Act and

the TSR, simply requiring Defendants to comply with the law.  Section III would require

Defendants and affiliated businesses and persons to maintain records.  Section IV would require

Defendants to report new business activity and would allow Plaintiff to monitor Defendants'

order compliance.  Sections V through X and XVII would address the appointment of a

temporary receiver to act as the agent of this Court.  The requested preliminary injunctive relief

is within the equitable powers of this Court and will protect consumers from suffering further

injury during litigation.[119]

### B.    Appointment of a Temporary Receiver

As noted above, the FTC seeks appointment of a receiver over the three Corporate

Defendants.  The Court has inherent power to appoint a receiver incident to its statutory authority

to issue permanent injunctions under Section 13(b) of the FTC Act.  *FTC v. U.S. Oil & Gas*, 748

F.2d 1431, 1432 (11th Cir. 1984); *see, e.g.*, *A1 DOCPREP*, No. 17-cv-07044 (order).  A receiver

is necessary when a corporate defendant has deceived the public.  *SEC v. Keller Corp.*, 323 F.2d

397, 403 (7th Cir. 1963) (It was "hardly conceivable that the trial court should have permitted

---

[117] *Id.* ¶ 17, Att. J.

[118] *Id.* ¶¶ 11-14, Atts. D-G (calculating that Corporate Defendants made payments of:
$390,000.00 to Andre and Gloria Frere jointly; $263,491.87 to Justin Frere; $137,285.21 to
Gloria Frere; and $73,408.00 to Sonoma Stainless, Inc.); Ortiz Att. J.

[119] *See supra*, Section V.A.

those who were enjoined from fraudulent misconduct to continue in control of [the corporate defendant].").

With Defendants in control of their operations, they are likely to destroy evidence and dissipate the fruits of their fraud. As discussed above, there is reason to believe that Frere has transferred millions of dollars from Corporate Defendants to himself. Moreover, Frere has already moved over $2.4 million to a foreign bank account located in Andorra.[120] Defendants may continue to hide and dissipate these ill-gotten funds, which are necessary to provide consumer redress, if this Court does not act.

A neutral receiver would prevent further harm to consumers and would locate and secure assets and records without disrupting any legitimate business activity. A receiver would also help assess the extent of the fraud, trace its proceeds, prepare an accounting, and make an independent report of Defendants' activities to the Court.

## VIII.    CONCLUSION

Defendants have caused and likely will cause substantial public injury through their unlawful student loan debt relief scheme. The FTC respectfully requests the proposed Preliminary Injunction be issued to protect the public from further harm and help ensure effective relief for those already harmed.

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Dated:  March 2, 2018                              _____/s/ Sarah Schroeder_____
                                                  Sarah Schroeder
                                                  Roberta Tonelli
                                                  Evan Rose
                                                  Attorneys for Plaintiff

                                                  FEDERAL TRADE COMMISSION

---

[120] Ortiz ¶¶ 35-37, Att. AA.