Sanjay Bhandari (SBN 181920)
sbhandari@mcnamarallp.com
Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile: 619-269-0401

*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 4:18-cv-00806-SBA |
| Plaintiff, | **PRELIMINARY REPORT OF RECEIVER** |
| vs. | |
| AMERICAN FINANCIAL BENEFITS CENTER, a corporation, also d/b/a AFB and AF STUDENT SERVICES; AMERITECH FINANCIAL, a corporation; FINANCIAL EDUCATION BENEFITS CENTER, a corporation; and BRANDON DEMOND FRERE, individually and as an officer of AMERICAN FINANCIAL BENEFITS CENTER, AMERITECH FINANCIAL, and FINANCIAL EDUCATION BENEFITS CENTER, | |
| Defendants. | |

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. IMPLEMENTATION OF PRELIMINARY INJUNCTION ................................... 2

    A.    Receivership Entities ................................................................................. 2

    B.    Business Location ...................................................................................... 2

    C.    Cooperation ............................................................................................... 4

    D.    Suspension of Operations ......................................................................... 5

III. BUSINESS OPERATIONS ................................................................................... 5

    A.    Business Structure ..................................................................................... 6

    B.    Customer Contact Points ........................................................................... 7

IV. CAN THE BUSINESS OPERATE LEGALLY AND PROFITABLY? ................... 7

    A.    The Poisonous Sales Environment ........................................................... 8

    B.    Eligibility – Defendants Appear to Have Mitigated Most Problematic
           Representations ......................................................................................... 9

    C.    Family Size – Defendants Continue to Unlawfully Manipulate and Inflate
           Family Size Numbers ............................................................................... 11

    D.    Advance Fees – Defendants Continue to Charge Advance Fees to AFBC
           Clients..................................................................................................... 18

    E.    FEBC – Defendants Continue to Enroll High Numbers of Consumers in
           FEBC ...................................................................................................... 21

        1.    Defendants' Deceptive Practices Involving FEBC ................................... 21

        2.    Nearly All Clients Were Enrolled in FEBC .............................................. 25

        3.    Consumers Did Not Use the FEBC Benefits ............................................ 27

    F.    Forbearance ............................................................................................ 28

    G.    Cost of Acquisition ................................................................................. 29

    H.    Could Illegal Practices be Remedied? ..................................................... 30

V. FINANCIAL INFORMATION .............................................................................. 31

VI. CONCLUSION ..................................................................................................... 32

# PRELIMINARY REPORT OF RECEIVER

I was appointed Receiver of the Corporate Defendants by the Court's Modified Preliminary Injunction Order entered November 29, 2018 ("Preliminary Injunction," ECF No. 187). By this Preliminary Report, I report to the Court on my team's review of the Corporate Defendants' operations and conclusions concerning their ability to operate legally and profitably going forward.

## I.

## INTRODUCTION

In ordering the appointment of a Receiver, the Court expressly cited the need to "determine whether and to what extent Defendants' business practices may lawfully continue." (Order Granting Motion for Preliminary Injunction (the "Order"), ECF No. 186 at 25.)[1] Section VI.S of the Preliminary Injunction empowers the Receiver to suspend business operations if such operations cannot be continued legally and profitably.

Based on our review to date, and as detailed below,[2] we conclude that Defendants' businesses cannot operate legally and profitably going forward. Even at this late stage – having been in litigation with the Federal Trade Commission ("FTC") since the summer of 2017 – deceptive and illegal practices are ingrained in, and are central to, the profitable operation of the business. In particular, the sales process remains dependent on overt encouragement to consumers to inflate family size and misrepresentations as to the Financial Education Benefits Center ("FEBC") membership. While some of the illegal practices could, in theory, be removed through a wholesale overhaul of the Sales Department and an aggressive, effective compliance

---

[1] As detailed in the Order: "First and foremost, the Court finds that a receiver is necessary to determine whether and to what extent Defendants' business practices may lawfully continue. . . . Defendants' misrepresentations are material and go to the core of their services. Appointment of a receiver presents the best option to halt unlawful business practices. If certain of Defendants' business practices may lawfully continue, appointment of a receiver also presents the best option to untangle the lawful from the unlawful, provide notice to consumers, mitigate consumer harm and minimize any disruption in the processing of consumers' applications and recertifications." *See* Order at 25.

[2] While our review could continue for many additional weeks, if not months, we do not feel further review would change our fundamental determinations. Even a limited review of the documents has revealed that the problematic practices still in place were pervasive.

program, such an effort would be prohibitively expensive and would dramatically reduce sales. The removal of illegal advance fees, which continue to be drawn on legacy AFBC clients, would deplete cash flow.  Finally, the FEBC program (monthly membership fees for services of little value) could not survive any compliance clean up.  Since FEBC accounted for all of the Corporate Defendants' aggregate profits, there is no business at all without FEBC.

Based upon this determination, we have suspended all operations.  We will now transition into permanent cessation of operations, and will take all necessary steps to protect consumers.

## II.

## IMPLEMENTATION OF PRELIMINARY INJUNCTION

### A.    Receivership Entities

The entities subject to the receivership are expressly defined to include the "Corporate Defendants": American Financial Benefits Center ("AFBC"), d/b/a AFB and AF Student Services, AmeriTech Financial ("AmeriTech"), and Financial Education Benefits Center ("FEBC"), and each of their subsidiaries, affiliates, successors, and assigns.  Preliminary Injunction, Definition B, at 2; Preliminary Injunction § V.

### B.    Business Location

As directed by Section VI.G of the Preliminary Injunction, we secured and took exclusive custody of Defendants' current business location at 5789 State Farm Drive, Suite 265, Rohnert Park, CA 94928 at 10:00 a.m. on Friday, November 30, 2018.

Upon our arrival, nine employees and James Vorhis, counsel to Defendants, were present. Mr. Vorhis remained onsite all day. With two exceptions – Thomas Knickerbocker, Executive Vice President, and Jennifer Martinez, Office Manager – the employees were immediately dismissed.  Our primary goals for the first day were to secure the facilities, secure the IT and related cloud infrastructure and accounts, identify bank accounts, and suspend all customer charges pending our review.  We initially met with Mr. Knickerbocker to get our arms around Defendants' sophisticated and extensive IT systems, and Ms. Martinez to gain control of the

///

Corporate Defendants' bank accounts.[3]  At our request Yessica Ayala, Manager of Operations, came to the office at roughly 2:00 p.m. to implement the suspension of customer billings, which she completed that evening.

The Rohnert Park location is a massive, well-equipped and professional office suite. Defendant Brandon Frere ("Frere") maintains an office at this location.  The Management, Retention, Verification, Processing, Billing, Collections, IT, and Customer Service Departments are also located here.  The space contains 13 offices, 150 cubicles (of which 62 appear to be in use), a kitchen, and a break area.  Approximately 70 employees have been based at this location. Defendants have leased the space since March 2016, with monthly rent of $26,437.  We had the locks changed and secured the location.

We returned to the Rohnert Park location the following week on Monday, December 3, and continued the process of reviewing documents and data.  We called several employees in for interviews in order to get up to speed on the business operations as efficiently as possible.  We returned again the following week, and we anticipate returning as necessary in order to shut down both sites, return personal property, protect consumer information, and vacate the premises.

Defendants maintain a second location at 1101 Investment Boulevard, Suite 290, El Dorado Hills, CA 95762.  We did not enter that space on November 30, 2018, but we did have a locksmith change the locks and secure the property with Branch Manager Daniel Henry.  We were informed that between 15 and 25 employees work from this location.  On December 4, 2018, at approximately 9:00 a.m., we entered this site.  No one was present.  The site is an approximately 12,000 square foot suite and houses the Sales Department, including the trainees, and some of the IT employees.  There are 4 offices, 93 cubicles (of which 24 appear to be in use), a small kitchen, a conference room, and a training room.  The rent is approximately $17,365 per month.

---

[3] We learned after getting control of the bank accounts that Frere had withdrawn $400,000 from the Corporate Defendants' bank accounts the previous afternoon, just minutes before the Preliminary Injunction issued.  This action is the subject of an OSC Contempt filed by the Receiver.  (ECF No. 189.)

Over the last three weeks, my team and I have analyzed the operations of the Corporate Defendants. In the course of our investigation, we have done the following: interviewed employees; reviewed paper documents; reviewed electronic documents, including internal employee chats and emails; sampled customer call recordings; spoke with customers; reviewed numerous customer records in Salesforce (the extensive customer relationship management database or "CRM" used by Defendants); conducted numerous Salesforce searches; and generated multiple Salesforce reports.

## C. Cooperation

Throughout our investigation, we have maintained regular communications with the FTC and defense counsel. We have invited counsel to bring to our attention information and evidence they believe should be considered. The FTC has done so, and we have considered this evidence and information in reaching our conclusions as set forth below. Defendants have thus far not provided any additional information. While we have not spoken with Frere,[4] we have interviewed a number of managers and director-level employees. These interviews took place on November 30 and December 3, 4, 5, and 13. Generally, the employees were cooperative and credible, but most disclaimed knowledge of the sales process particulars.[5]

As to Frere, we filed a contempt application on December 4, 2018 (ECF No. 189) relating to his withdrawal of $400,000 from corporate accounts just hours after counsel received notice from the court clerk that a ruling on the FTC's Motion for Preliminary Injunction was imminent. The Court entered an Order to Show Cause re: Contempt on December 7, 2018 (ECF No. 194) and held a hearing on December 20, 2018, which was continued for further briefing, if necessary. To date, Frere's parents, Gloria and Andre Frere, have returned $15,000 Frere sent to them, as

///

---

[4] Frere was recently arrested on criminal charges related to the activities alleged in the FTC's action in this case.

[5] The exceptions were Dan Henry, with whom we spoke on December 4, 2018, and Jason Cutter, VP of Marketing and Business Development, with whom we met briefly on December 13. Mr. Henry, the El Dorado Hills Branch Manager, was responsible for managing the sales agents located at the El Dorado Hills site. We spoke with Mr. Henry for approximately three hours. Both Mr. Henry and Mr. Cutter were generally cooperative.

have Frere's brother, Justin Frere ($7,500), and Cameron Henry, a former employee of Defendants ($9,000).

**D.    Suspension of Operations**

As authorized, we suspended operations as we undertook an investigation. The steps taken to implement this suspension have included: suspending scheduled consumer payments; deploying a team of three employees to telephone approximately 250 consumers who had an upcoming event (*i.e.*, recertification deadlines) to urge them to contact their servicer directly; and posting notices on all of Defendants' websites and on the Receiver's website advising clients to contact their loan servicers directly. We will also deploy an informational telephone greeting on incoming phone lines and will send a global email to clients who have an email address in the CRM database.

When we took control, payroll had not been run in nearly two weeks. As detailed in our contempt motion, Frere had substantially depleted the corporate accounts just prior to my appointment. After much encouragement from the Receiver, Frere agreed to return funds to the receivership to run payroll. We have received an Order permitting the Receiver to use the money Frere returns to fund payroll.[6] As of this report, payroll to the employees for their regular wages (*i.e.*, no bonuses, reimbursements, etc.) for the period November 19-29, 2018 has been processed.

On December 20, 2018, the Receiver gave an oral report of his findings to FTC and defense counsel. He again invited the parties to present any information which was inconsistent with his oral findings.

**III.**

**BUSINESS OPERATIONS**

The details of Defendants' business operations have been reported in multiple filings by the FTC and Defendants. This Court's Orders, and specific fact findings therein, reflect great

---

[6] The Parties' Stipulation and [Proposed] Order to Fund Pre-Receivership Payroll (ECF No. 201) was filed on December 19, 2018, and the Court issued the Order on December 21, 2018. (ECF No. 203.)

familiarity with Defendants and their businesses. A detailed recitation of the sales, enrollment, customer service, processing, and billing practices, is not, therefore, necessary. Rather, we will briefly describe the structure of operations as we found them upon entering the business. Then, we will turn to the primary mission assigned by the Court: to determine whether the business or any aspect of the business can be operated legally and profitably.

### A. Business Structure

The back-end and management functions were run out of the Rohnert Park office with roughly 60-70 permanent and temporary employees, mostly in Customer Relations (including Customer Service ("CS") and Retention Departments) and Customer Fulfillment (including Billing, Processing, Rehabilitation, and Collection Departments). The Vice President of Operations and Sales, the Marketing Manager, and other operational functionaries were also located in this office. Interestingly, Frere had also assembled a publicity team at this site – eight full-time employees and one part-time employee – to flood the internet with favorable press releases, tweets and blogs, which quoted him on an array of topics. We understand this was Frere's effort at reputational management. A very robust IT team of eight people, led by an Executive Vice President, operated from both Rohnert Park and El Dorado Hills.[7]

The entire sales operation was run from the El Dorado Hills office, located 110 miles away from Rohnert Park. At the time the Preliminary Injunction was entered, there were roughly 30 permanent and temporary sales agents at this site. As more fully discussed below at Section IV.A, the Sales Department was in a constant state of flux, as employees were routinely terminated when they failed to meet sales quotas. We were told the churn rate in sales agents was extremely high, with one estimate being a turnover rate of 80%.

///

///

---

[7] Defendants employed extensive and sophisticated technological solutions to run the business. As a result, there is a mind-boggling amount of data. According to the Executive Vice President, there were 14 terabytes of data on the Salesforce customer relationship management platform AmeriTechCRM, several terabytes of recorded calls, and 5-6 terabytes of G Suite data, including some 400 email accounts, stored in various cloud locations.

## B.    Customer Contact Points

When a consumer called in response to a solicitation, the first person he or she spoke to was a sales agent, internally referred to as an "Account Specialist."  Consumers who were convinced to "enroll" were transferred to a verification agent who walked them through a series of agreements to accomplish enrollment.  One of the practical consequences of enrollment was that the consumer would never talk to the sales team again – all contact from that point forward was run through the CS Department, regardless of the issue.[8]  Once the consumer provided the necessary documents and loan servicer login credentials, a member of the processing team would determine which, if any, program was suitable for the client – an income-driven repayment ("IDR") program (either income-contingent repayment ("ICR") or income-based repayment ("IBR")) and/or public service loan forgiveness ("PSLF") program.  Processing would then fill out and submit the paperwork on the consumer's behalf.  In the usual course, the consumer would not be contacted during this part of the process.  If Processing had a question for the consumer, the question would be routed through CS.

Defendants appeared to have standard procedures in place to assist consumers in completing the annual recertification of income and family size to their loan servicer.  We were told that Defendants routinely began reaching out to consumers approximately three months before annual deadlines to gather documents for recertification.

## IV.

## CAN THE BUSINESS OPERATE LEGALLY AND PROFITABLY?

As the Court is well aware, Defendants' ostensible business purpose was to offer document preparation services to consumers with student loan debt who wanted to reduce their monthly student loan payments and to sell "monthly membership benefits" (at different price tiers).

///

///

---

[8] One exception appears to be that, on occasion, Processing would send emails directly to consumers requesting documents.

In determining whether Defendants' businesses could operate legally and profitably, we have been guided by the Order. Although the Order addressed multiple deficiencies in Defendants' business model, it highlighted five specific practices as cause for concern:

1. Misrepresentations regarding clients' eligibility for student loan forgiveness and the amount they would save under IDR/PSLF plans, *id.* at 4-5;

2. Encouraging or suggesting that clients enlarge their family size in order to qualify for lower monthly loan payments under their new repayment plan, *id.* at 6-7;

3. Withdrawal of advance fees for debt relief services in violation of the Telemarketing Sales Rule ("TSR"), *id.* at 8-9;

4. Deliberate creation of confusion regarding the use of the fees clients were paying, including the conflation of FEBC and Defendants' document preparation services, *id.* at 9-10; and

5. Placement of clients' loans in forbearance, sometimes for lengthy periods of time, while clients still paid fees to Defendants which they believed were being credited to their loans, *id.* at 11.

We focused our investigative efforts on these five practices – each reviewed below. At a high level, we have concluded that Defendants have remedied some of the issues with program eligibility and savings misrepresentations and with the advance fee escrow model (with the exception of legacy AFBC clients as discussed below). We do not have enough data to reach conclusions about Defendants' use of forbearances, other than to note that the large scale metrics appear troubling. On the other hand, Defendants' unlawful sales tactics concerning family size and FEBC have continued relatively unabated (despite the FTC lawsuit), and we have concluded, for the reasons discussed below, that any attempt to remedy them would be futile.

**A.      The Poisonous Sales Environment**

The vast majority of Defendants' unlawful conduct can be traced to the Sales Department. Although employees in other departments described a relatively positive working environment, the Sales Department – located two and a half hours away in El Dorado Hills – experienced a high degree of employee burn-out, likely due to the high-stress working environment. Sales employees' performance was more closely monitored than that of employees in other departments.[9] Sales employees were constantly placed on performance improvement

_____

[9] Management received daily sales performance reports detailing each employee's performance across multiple categories. Sales employees were given a very short leash to

plans ("PIPs") – many employees moved from one PIP to the next with no or little time in between.  Turnover was high (around 80%) and temporary sales agents were hired and terminated on a regular basis.

All of this created an environment where sales agents were incentivized to sell Defendants' "program" (document preparation services and the FEBC program) at any cost. Failure to sell resulted in swift unemployment.

**B.      Eligibility – Defendants Appear to Have Mitigated Most Problematic Representations**

The mailers which the Court identified as problematic in its Order included representations that the consumer was "eligible" or "pre-qualified" for Defendants' programs, which the Court concluded were false, as Defendants could not guarantee that any given consumer would qualify for the federal programs. *See* Order at 4, 14.  According to Mr. Cutter, Defendants have since phased out direct mail because of low "hit rates," *i.e.*, consumer enrollments.[10]

Defendants now source leads from third parties who employ multiple sales channels. Mr. Cutter stated that the active advertising campaigns were Facebook, text messaging (SMS – through a third party provider), Live – PC ("warm transfers" of a pre-qualified, interested lead developed by third party call centers), and leads provided by a company called Moby Apps.[11]  It is troubling, given Defendants' past problems and the instant litigation, that Defendants do not design or review ads.  Mr. Cutter explained that Defendants would be apprised of an advertisement's content only if they received complaints from consumers, in which case

_____

perform or be terminated.  This "sell or be fired" approach accounts for the extremely high employee churn rate.

[10]  We found evidence that mailers were used as recently as March of this year.  *See* Appendix, Exhibit 1 (mailers returned to sender on February 21, 2018 and March 3, 2018).

[11]  *See* Appendix, Exhibit 2 ("Lead Source Definitions As of 2/27/2018").  Each lead cost anywhere from $10 to $60 with the most expensive related to a "Direct Sales Campaign," which involved the use of mailers.  Notably, the lead cost is just the beginning.  The "cost of acquisition" – that is, the cost of converting a "lead" into a customer – is extremely expenseive. We have seen weekly reports reflecting that the cost of acquisition ranges from the $100s to $900s to acquire a customer.

Defendants would pass along those complaints to the vendor and ask them to change the ads. Our review has generally corroborated Mr. Cutter's explanation of the process. The most recent iteration of the Facebook ads that we were able to locate dated to March 28, 2018. *See* Appendix, Exhibit 3 (Mar. 28, 2018 Email). The limited number of ads we have reviewed do not imply that the viewer was "eligible" or "pre-qualified," the practices which the Court found most concerning, and this does suggest that these misrepresentations may have been mitigated. However, we do not have enough information to reach anything more than a tentative and limited conclusion on this point.[12]

The other misrepresentations identified by the Court occurred post-solicitation, on sales calls. The Court noted that "[i]n many instances, Defendants [would] advertise or promise payments and savings in specific dollar amounts. Given the requirements of alternative repayment plans, however, Defendants c[ould ]not legitimately promise such results." Order at 14; *see* Appendix, Exhibit 5 ("T-Box Training Sheet") (scripting language which prompted the sales agent to tell the consumer the amount that he or she would be "on track" to save after enrolling in one of the student debt relief programs that Defendants would apply for on the consumer's behalf). Our preliminary review indicates that Defendants are currently providing disclosures (required to be read under compliance standards) which address the items the Court found most troubling. In discussing "Annual Renewal," for example, sales agents are required to say:

> As part of the program we will recertify your file on an annual basis. What that entails is one of our representatives reaching out to you to check on your current situation. **These are all income driven repayment plans so in the event your income changes, your payments may change.** Family Size is variable as well. If your Family size changes, your payment could change.

---

[12] As late as August 2018, Corporate Defendants received calls from consumers responding to Facebook ads and text messages to "permanently remove your student loan." A consumer sent a copy of one ad to Defendants. Mr. Cutter then spoke with a third-party marketing company who confirmed that they ran the Facebook ad that said "APPROVAL to REMOVE ALL STUDENT LOANS. . . . PERMANENTLY REMOVE YOUR STUDENT LOAN . . . STUDENT FORGIVENESS." *See* Appendix, Exhibit 4 (email from consumer to David Asplund dated Aug. 8, 2018 at 9:58 a.m. and email from Jason Cutter to Brandon Frere and Chuck Gangnath dated Aug. 23, 2018 at 3:32 p.m.).

*See* Appendix, Exhibit 6 at 3-4 (emphasis added). We have listened to calls and read transcripts in which the sales agents do make the above disclosures and other comments which appear to mitigate the Court's concerns. Having said that, these disclosures do come in the context of the T-Box sales discussion where long-term savings projections are central to the pitch. Given the more serious continued violations concerning family size and FEBC discussed below, we have not expended significant energy delving into the detailed particulars of this issue.

## C. Family Size – Defendants Continue to Unlawfully Manipulate and Inflate Family Size Numbers

The Court's November 29 Order put a spotlight on Defendants' misconduct regarding family size. *See id.* at 14 ("Defendants also systemically encourage[d] borrowers to inflate their family size, thereby enrolling them in programs for which they m[ight] not be eligible."). Our review to date has revealed that this continues to be a problem. Sales agents routinely lead and encourage consumers to falsely inflate family size.

The employees we interviewed all stated that sales agents were required to read Defendants' scripts, and certain parts of the script <u>had</u> to be read verbatim for compliance purposes. The Compliance Department then regularly audited sales calls to ensure sales agents were reading the scripts. The sales script presently in use includes the following mandatory language addressing family size:

> 15. [Compliance: Family Size] Next I need to go over family size. Family size may be different from what you claim as dependents on your tax return. It is a figure that you provide for your application, that basically covers the number of people that you support. Again, not just dependents. I am required to read you the family size definition:
>
> a. "Family size includes you, your spouse, and your children (including unborn children who will be born during the year for which you state your family size), if the children will receive the majority of their support from you now.
>
> b. It also includes other people that live with you that receive the majority of their support from you, and they will continue to receive this support from you for the year that you state your family size. Support includes money, gifts, loan, housing, food, clothes, car, medical and dental care, and payment of college costs."
>
> 16. Couple of things to keep in mind with family size. The higher your family size, the lower your Student Loan payment. And the lower your family size, the higher your payments may be. That is because certain government loan programs take into account not just your income, but the amount of people you are support.

*See* Appendix, Exhibit 6 (Account Specialist Enrollment Script (20170911)) (emphasis removed).[13]

Sales agents' manipulation of family size numbers was thus, in theory, heavily regulated by Compliance call review. Compliance protocols identified a list of "bad" items for sales agents to avoid, and family size enlargement was identified as a "bad" item from the inception of the "bad" list, appearing in all future iterations of that list. *See* Appendix, Exhibit 7 ("Unacceptable Enrollment Items, AKA: The BAD '9'" (Oct. 3, 2016)); Exhibit 8 ("Unacceptable Enrollment Items, AKA: The BAD '15'" (Aug. 17, 2017)); and Exhibit 9 ("How to avoid BAD Items during your enrollment calls" (Dec. 18, 2017)).

Our review has shown, however, that such Compliance protocols were <u>not</u> applied with force or regularity. Although several employees described the Compliance Program as rigorous, this was not borne out in our review of sales call recordings, audit reports, sales call transcripts, and internal employee chats, including chats between members of the Compliance Department. Significant violations continued up to and including the day before the Preliminary Injunction was issued, suggesting that Defendants' sales process was inherently flawed and incapable of being cleansed, particularly with respect to the issue of family size.

The rigor of the compliance reviews and sanctions for violations seemed to be employed on a sliding scale – successful sales agents were not sanctioned or received a slap on the wrist. Veteran sales agents with high customer enrollments were given more leeway with compliance violations, including violations related to family size, than other new and temporary employees. This troubling pattern is perhaps best exemplified by Maryam Pourmohammad, one of Defendants' highest-achieving and longest-term sales agents. Ms. Pourmohammad was put on PIPs and written up for violations throughout her tenure at Defendants' businesses, and yet the records indicate that she was retained and received significant bonuses.

At least as far back as October of 2017, Ms. Pourmohammad was being written up for compliance violations involving family size, including, *e.g.*, telling one client that "based on

---

[13] Mr. Henry, the manager of the El Dorado Hills location, reported that this was the most current script.

your income you would need to be supporting a FS [family size] of 14…and don't get scared, it doesn't need to be immediate family." *See* Appendix, Exhibit 10 (Oct. 2017 Compliance Report). Ms. Pourmohammad proceeded, on the same call, to give incorrect examples of individuals who would qualify towards the family size total, including "aunts, uncles, nieces, nephews, mother/father in law." *Id.* Just two months later, in December of 2017, she was flagged for submitting a family size of 16. Her immediate boss counseled her on the call. Incredibly, rather than advising her to be honest, the supervisor instructed her on tactics to avoid having the file rejected:

> Also, in regards to Family Size, a Client stated 16 and the file was converted. I informed Maryam that the file would probably be rejected especially because the loans were with Fedloan and the Client is single making approx. $16,000 a year (give or take).
>
> Maryam [should t]ell the Client there is no reason to state such a high number. We don't want the file to get rejected. If 8 would get the Client the lowest payment then no need to go with 16. She should tell the Client we work with them on a daily basis and know the "end [*sic*] and outs". Stating 8 would be plenty to suffice.

*See* Appendix, Exhibit 11 (Dec. 2017 Note to File). Compliance's review of the call is also troubling. Rather than identify the family size manipulation as a problem, the audit report was a perfect 100%. The sales agent was given a "5" (out of 5) for family size, apparently because she read the required script. *See* Appendix, Exhibit 12 (Compliance Enrollment Call Audit). More troubling still is that Ms. Pourmohammad was not instructed to obtain an accurate family size number from the potential customer; she was instead instructed to lower the family size number so that the application would escape scrutiny.

Ms. Pourmohammad's inflation of family size was a regular occurrence and something it appears Compliance willfully overlooked. For example, on October 22, 2018, Ms. Pourmohammad conducted one of the more troubling sales calls we have reviewed with respect to family size. As required by the Defendants, she read the required family size language in the sales script to the consumer. However, immediately after she read the language, the consumer asked whether his roommate and his daughter (who did not live with him) would count towards his family size. Ms. Pourmohammad responded:

> I mean, you can put whoever you want on there. The definition that I read to you
> has nothing to do with your personal taxes and those aren't the people that you
> put on there as a dependent. It literally has nothing to do with the IRS.

*See* Appendix, Exhibit 13 (Transcript of Oct. 22, 2018 Call). The consumer then said he has a

family size of three. After Ms. Pourmohammad reviewed the consumer's information and went

over his potential savings under an IDR plan (the "T-Box" portion of the call), she said:

> [W]ith a family size of three and your current income, . . . the numbers come back
> very negative when it comes to the savings portion of it, but if you were to have a
> family size of seven, your payment – you're going to save about $41,283. . . .
> Now, the reason why I'm giving you a different family size option is because, like
> I said, a lot of people get confused by the definition and they think about their
> personal taxes and who they put on there as a dependent. . . . [T]he definition just
> says family size includes – you know, the support includes money, gifts, loans,
> housing, food, clothes, car, medical and dental care, and payment of college costs.
> Based on that, knowing that has nothing to do with your personal taxes, would
> your family size stay at a three or would it be a completely different number?
> Knowing it has nothing to do with your taxes.

*Id.* The consumer followed Ms. Pourmohammad's lead and stated that his family size was

seven, listing his brother, his brother's wife, and their three children. Ms. Pourmohammad then

replied that she did not need to know what the consumer did for his "family," who they were, or

where they lived. A particularly troubling aspect of this call was that, once again, the

Compliance Department's audit gave Ms. Pourmohammad a compliance score of 100% for the

call. *See* Appendix, Exhibit 14 (Oct. 22, 2018 Compliance Audit).

     And, remarkably, this was not the only time this occurred. As just one other example, a

July 2, 2018 call of Ms. Pourmohammad's included the following audit notes:

> 24:30 Bad 15- Tells the client they can add whoever they want to FS and we don't
> need to know who they are when the client talks about their deceased mother.

*See* Appendix, Exhibit 15 (Client History as of Dec. 20, 2018) at 8. Although an infraction was

noted, Ms. Pourmohammad received a 100% compliance score for the call. *See* Appendix,

Exhibit 16 (July 2, 2018 Compliance Audit). The client, who had an estimated total federal loan

balance of $175,110 (all of which were defaulted, with the balance approximately $21,000

overdue), enrolled with a family size of 14; he was paying for the most expensive FEBC

package, $99 per month. *See* Appendix, Exhibit 15 (Client History as of Dec. 20, 2018) at 4, 7.[14]

---

[14] Although not related to the sales process, a review of this client's records show that
even though his documentation was never completed and, therefore, an IBR was not submitted,

These calls, which occurred within the last six months (one as recently as one month before the Court issued the Preliminary Injunction), are not the only example of Defendants' continued efforts to manipulate consumers' family size. The Receiver employed a team of four review attorneys to review recent sales calls. The review attorneys noted the following as particularly egregious examples of family size inflation, though the practice was endemic:[15]

- In a January 24, 2018 sales call, the consumer first stated that she did not provide any support to anyone. The sale agent wrote down one for family size. When the monthly payments were higher than expected, the sales agent suggested that she include her parents because she was moving in with them soon. The sales agent said her family size was three. During the call, the sales agent had to speak with her manager. When she returned to the call, the sales agent told the consumer that the sales agent could not say who to include in family size and that it was up to the consumer's interpretation. When the sales agent asked whether the consumer wanted to move forward with a family size of three, the consumer said yes.

- In an August 14, 2018 call reviewed, the consumer initially stated that she had a family size of one (herself). The sales agent then went over the types of support that qualified (without mentioning that it had to be a majority of the support) and asked if there was "anyone else that you might be supporting" because "every person [claimed] helps your situation." The consumer said she "sometimes help[ed] [her] mom out with her bills…here and there." The sales agent repeated that it was up to the consumer's "interpretation of the definition" and that "**until you get to a family size of about seven people aren't even going to ask about**

document preparation fees were withdrawn from his RAM escrow account. *See* Appendix, Exhibit 17 (RAM Client 2 Ledger). His escrow account presently has a sitting balance of $0.00. *See id.*

[15] Only one of the calls summarized below involved Ms. Pourmohammad, showing that family size inflation was a department-wide issue as opposed to a problem with one rogue employee.

**it**." The consumer then mentioned that she sometimes helped out her niece as well, for a family size of three.

- In an August 29, 2018 call reviewed, the consumer initially stated a family size of one after hearing the definition; the sales agent then said she wanted to "touch on this" because "every person in your family size does help lower those [monthly IDR] payments a little bit." The sales agent stated that the "range of support is pretty wide," "the definition is up to your interpretation entirely," and that "legally" she was not allowed to define it for him but "every person counts." The consumer then stated he had a girlfriend who lived with him and a grandmother who had just moved out, for a family size of three.

- In an October 9, 2018 call reviewed, when a consumer stated that she had one child, the sales agent told her to "keep in mind" the broad definition of "support"; the consumer then stated that she supported her adult son and would also "do things" for her mother-in-law, at which point the sales agent asked if that was "two others" and, once the consumer confirmed that, prompted the consumer to confirm this was a family size of five.

- In a November 2, 2018 call reviewed, the consumer initially stated she had a family size of two. However, the sales agent then told her that "with a family size of two, the numbers come back negative, but with a family size of four, that's where you have a lot of savings." The consumer began to ask for advice, and the sales agent said, "honestly, you can put whoever you want on there based on the definition." The consumer enrolled with a family size of four as the sales agent suggested.

- In a November 21, 2018 call reviewed, the consumer initially stated he did not provide support for anyone under 18 after hearing the family size definition. The sales agent then reiterated that he would not ask who the consumer was including or how the consumer supported them, and stated that family size was "just the number that you give me…**It's actually one of those situations where it's**

**almost better if I don't know who they are**."  The consumer then said he was providing support for three individuals under 18.

Consumer call recordings were not the only evidence of Defendants' efforts to increase family size.  Employees frequently communicated with each other via the chat feature in Google G Suite.  Reviewing the employees' chats has revealed that there was an overwhelming awareness of the practice and ongoing encouragement to increase family size.  Some examples include:

- Employees regularly requested authorization to increase consumer's family size. For example, in one chat Ms. Pourmohammad first asked for approval of a family size of nine (with zero children) and then asked it to be increased to eleven.  *See* Appendix, Exhibit 18 (Chat dated September 26, 2018 at 12:17 p.m. from Maryam Pourmohammad to Timothy Arquilla).  The next day, Ms. Pourmohammad said a consumer's family size was ten and minutes later asked Mr. Arquilla to change it to fourteen.  *See* Appendix, Exhibit 19 (Chat dated September 27, 2018 at 12:52 p.m. from Maryam Pourmohammad to Timothy Arquilla).

- Employees knew that increasing family size resulted in lower estimated monthly student loan payments.  One employee noted that a consumer's family size was too low and "she wouldnt budge," suggesting that the employee wanted to get the consumer to give higher family size numbers, so she could quote the consumer a lower monthly payment.  *See* Appendix, Exhibit 20 (Chat dated October 18, 2017 at 12:50 p.m. from Dalton Ostrander to David Worden).

Employees openly discussed increasing family size.  In a group chat, one employee stated "[v]ia Jason [Cutter] we can restate the family size script as much as we want and chop it up any way that we want after the 1st read through to **help up family size**. . . ." (emphasis added).  Later in the group chat, another employee said "i've had guys tell me, right after reading that definition, that their fam size was 14 **without having to help them bump it up at all**."

///

(emphasis added). *See* Appendix, Exhibit 21 (Chat dated August 18, 2017 at 12:51 p.m. from David Worden to Ryan Vanvakaris, Eli Britton, and Edgard Canchola).

Our review has provided overwhelming evidence that Defendants – including the Compliance Department – were well aware of sales agents' pervasive efforts to increase consumers' family size and tacitly encouraged the practice by refusing to terminate high-achieving sales agents like Ms. Pourmohammad even when they violated compliance protocols. As stated above, the reason is apparent: family size was one of two variables used when calculating a consumer's reduced monthly payments under an IDR plan and the only variable which was easily manipulated. The higher the sales agent could get the consumer's family size, the lower the sales agent could set the consumer's monthly payment, and the more likely it was that the consumer would enroll in Defendants' document preparation services (and, as discussed at length *infra*, the more likely the consumer was to enroll in FEBC, inevitably). We view this practice as a key component of Defendants' business, without which Defendants would be unable to attract sufficient clients to keep turning a profit, even with the high profit margin on FEBC. *See* Section V. Consequently, we do not believe there is any way to remedy this issue in a way that would allow Defendants' businesses to continue to operate legally and profitably.

**D.      Advance Fees – Defendants Continue to Charge Advance Fees to AFBC Clients**

Our review indicates that on the whole, Defendants presently seem to be making good-faith efforts to comply with the TSR for AmeriTech clients. Our review of records drawn from Defendants' two AmeriTech payment processors, Reliant Account Management ("RAM") and Account Management Plus ("AMP"), generally confirmed that client payments for document preparation services are held in escrow until Defendants provided proof of work to the payment processors. Proof of work for IDR clients would be proof of the client's first payment under his

///

///

///

///

or her new IDR plan, often referred to by employees as "proof of performance" or "POP."[16,17] Several employees we spoke to confirmed this.

Although Defendants' billing practices for AmeriTech clients are structured in an attempt to comply with the TSR, the same cannot be said for their practices regarding legacy AFBC clients. Defendant AFBC is the company Frere initially founded in 2011. It continues to bill for both student loan documentation preparation and "monthly membership benefits." Faced with concerns that AFBC was taking advance fees in violation of the TSR, Frere shuttered the company in late 2015 in favor of AmeriTech and FEBC, where the document preparation and monthly membership fee functions were (in theory) separated. However, Defendants made no provision for the thousands of AFBC customers who were still enrolled in that program and who were continuing to be charged a $49 monthly fee. Although attrition has thinned the numbers in the last three years, AFBC was still billing 5,087 customers monthly at the time of the Preliminary Injunction. *See* Appendix, Exhibit 24 (showing that for all time, AFBC has 13,028 clients, of which 6,875 have a Cancelled status and 1,066 have a Manager Hold status, leaving 5,087 active clients).[18]

---

[16] The one exception is clients whose payments under their new IDR plans were $0 per month, in which case the only proof of work would be the approval letter for the new plan.

[17] We would note that although Defendants appear to be attempting to comply with the TSR, their fee plans were carefully structured to allow them to receive payments from escrow for FEBC-related fees. The first monthly payment included an "enrollment" fee which could be withdrawn immediately (along with the monthly FEBC membership fee) without providing POP for IDR application. *See* Appendix, Exhibit 22 (Fee Plan Structure). For the next few months under most fee plans, the fees charged would be fees for the forbearance (not IDR) application – a much simpler application to complete in that it did not require the client to provide documents or even servicer login credentials – and FEBC membership. *See id.*

This model allowed Defendants to ensure a steady stream of income for the first few months of clients' enrollment while they gathered the necessary paperwork from clients for the IDR application. *See* Appendix, Exhibit 23 (RAM Client Ledger) (showing the first draft of one client's account on July 20, 2017, with disbursement of funds to Defendants five days later for "Program Related Payment to Financial Education Benefits Center FEBC Enrollment" and "Program Related Payment to Financial Education Benefits Center FEBC Monthly," with the next month's "enrollment" fee switching to a "Program Related Payment to Ameritech Financial Forbearance Fee" in the same dollar amount).

[18] The billing manager confirmed that the AFBC clients are auto-drafted directly by legacy payment processors NMI, Payment XP, and Echeck.

We have confirmed in employee interviews that when an AFBC customer canceled the $49 monthly fee, the company would not continue to provide annual IDR recertification document preparation.[19]  In essence, therefore, it appears the legacy AFBC customers were paying $588 annually to have AFBC complete the recertification paperwork.[20]  And unlike the AmeriTech model, none of the monthly payments were held in an escrow-like account where the funds were released only upon a proof of performance.  Ms. Ayala confirmed that the payment processors for legacy AFBC clients do not have escrow capabilities and have no sitting balances.  Instead, AFBC took the monthly payments as fees immediately.  As a result, AFBC took advance fees from these clients once per month as fees for the annual document preparation.  Because these were advance fees for document preparation services, AFBC's auto-draft of these fees, without an escrow account to hold them until the work had been completed, appears to have violated the TSR.

I understand that the FTC is of the same view and likewise takes the position that a monthly fee for IDR recertification is a fee for a "debt relief service" under the definition in the TSR, *see* 16 C.F.R. § 310.2(o) – especially if, as was (and still is) the case here, the membership and IDR recertification were sold as part of the debt relief pitch at the outset.  Defendants seemingly recognized this fact, based on the wholesale revamp of their business and the adoption of a two-company approach.  Therefore, I do not believe that Defendants' continued monthly auto-drafting of the accounts of legacy AFBC customers is lawful, because it violates the advance fee provisions of the TSR.  *Cf.* Order at 18-19 (finding that the FTC showed a likelihood of success on the merits for its TSR claims and noting that it is "impermissible under the TSR" to "withdraw[ funds] from consumers' escrow accounts before they have been enrolled in a federal repayment program and made their first payment thereunder").[21]

---

[19]  In contrast, if a customer terminates his or her membership in FEBC, we are told AmeriTech will continue to provide annual recertification.

[20]  Of course, the monthly fee covered the "educational benefits" as well.  But, as discussed below, we do not put much value in these benefits.

[21]  It is worth noting that the AFBC customers at issue were all enrolled before the end of 2015.  During this time, the average family size reported by AFBC customers was 8.09 family members in 2014 and 6.03 in 2015.  I understand the national average family size during this

**E.      FEBC – Defendants Continue to Enroll High Numbers of Consumers in FEBC**

In our view, the FEBC membership sales are the most insidious aspect of Defendants' business.  Even at this late date, after extensive litigation with the FTC, the sales process for FEBC is rife with misrepresentation, lack of disclosure, and customer confusion.  Defendants have not acted lawfully in selling FEBC and cannot be trusted to do so going forward.  Since FEBC is the only profitable component of the business (*see* Section V below), there is no business without FEBC.

1.      Defendants' Deceptive Practices Involving FEBC

In the Fall of 2015, Frere pivoted his business model and jettisoned AFBC in apparent recognition that the AFBC model – which combined monthly fees for document preparation and membership "benefits" in a single package – was at severe risk given the TSR restrictions.  In its place, he established two companies: AmeriTech, to do the document preparation and FEBC to provide financial education and "benefits" for a monthly fee.

We began our assignment puzzled by the willingness of nearly every AmeriTech client to agree to FEBC fees.  The consumers contacting AmeriTech are generally in dire financial straits and were responding to a solicitation to reduce their monthly student loan payments.  Nevertheless, roughly 93% of AmeriTech clients were also paying for FEBC[22] – often to the tune of $99 per month.  Our review has led us to conclude that Defendants doggedly pursued consumers' enrollment in FEBC for one important reason – those fees were the driver of Defendants' operations.  If they wanted the business to be profitable, they had to enroll as many consumers in FEBC as possible.  Since late 2015, FEBC has generated more than $25 million in net profits.  *See* further discussion in Section V *infra*.  Given this extreme profit opportunity, and

_____

time was 2-3 family members.  *See also* Appendix, Exhibit 25 (20150106 Master Script).  Given our conclusion that the Defendants are unlawfully manipulating family size even at this late date – and that the average family size AmeriTech is reporting now is in the 4 range – it seems very reasonable to conclude that the high family sizes reported by AFBC customers were the result of family size manipulation.  This suggests that the customer acquisition was tainted by misrepresentation and supports my conclusion that continued billing would be unlawful.

[22] *See infra*, Section IV.E.2.

the fact that the document preparation business was not profitable as discussed *infra*, it is not surprising that Defendants and their employees were heavily incentivized to sell FEBC memberships to clients.

On November 18, 2015, Frere's counsel sent him a letter regarding the legality of the FEBC model, with the attorney's analysis premised on assumptions provide by Frere. *See* Appendix, Exhibit 26 (Nov. 18, 2015 Letter re: Financial Education Benefits Center, the "Counsel Letter").[23] Those descriptions were false, including:

- **Frere's representation:** FEBC would offer a "membership benefit program" that could be purchased on its own or in conjunction with student loan application assistance.

- **Reality:** Interviews with employees have confirmed that <u>no</u> client has ever enrolled in FEBC membership alone. Each and every FEBC membership was purchased on the initial sales call alongside document preparation services, clearly showing that FEBC membership was inextricably intertwined with Defendants' document preparation services.

- **Frere's representation:** FEBC's contract would be separate and apart from other programs.

- **Reality:** Although FEBC had a separate contract, that contract was provided in a single PDF document with a host of contracts related to Defendants' document preparation services. *See* Appendix, Exhibit 27 (July 7, 2018 Email and Attachment).

- **Frere's representation:** FEBC would be offered as an optional upsell when consumers called AmeriTech.

- **Reality:** Nothing we have seen has indicated that FEBC was broken out as an optional upsell. The most recent script that sales agents were using to explain FEBC membership stated that FEBC was "already built into the monthly payment

---

[23] The letter was designated as non-privileged by counsel and Frere provided the letter to a financial advisor hired to help Frere sell the business.

set up for your programs" or was "already factored into the payment that you have been quoted," suggesting that it was a part of Defendants' broader document preparation services. *See* Appendix, Exhibit 28 ("FEBC Enrollment Script" (May 22, 2017)).

- **Frere's representation:** Payment would be made directly to FEBC and the two companies would not share revenues.

- **Reality:** Clients' accounts were drafted for a single monthly payment through Defendants' payment processor; although document preparation fees were kept in escrow until POP was provided, the FEBC fees were withdrawn immediately and, therefore, consumers would not have been aware that they were paying for two separate programs. *See* Appendix, Exhibit 23 (RAM Client Ledger).

- **Frere's representation:** FEBC would not be bundled with AmeriTech services.

- **Reality:** As discussed *supra*, sales script language heavily suggested that FEBC was part of Defendants' document preparation "program." *See* Appendix, Exhibit 28 ("FEBC Enrollment Script" (May 22, 2017)).

- **Frere's representation:** FEBC would make a solicitation separate and apart from the document preparation transaction.

- **Reality:** The sales script currently in use does not explain what FEBC is until after the consumer has signed the agreements sent to him or her in a PDF packet, which includes the FEBC agreement, precluding any separate solicitation of the service. *See* Appendix, Exhibit 6 (Account Specialist Enrollment Script (20170911)). Defendants' earlier scripts were even more misleading. *See* Appendix, Exhibit 25.

- **Frere's representation:** Enrollment packages for FEBC would be separate and apart from AmeriTech's initial transaction and neither enrollment package would reference the other.

- **Reality:** Clients received the AmeriTech and FEBC agreements in a single packet (*see* Appendix, Exhibit 27 (July 7, 2018 Email and Attachment)) and

FEBC was not clearly distinguished from Defendants' document preparation services in the sales script (*see* Appendix, Exhibit 28 ("FEBC Enrollment Script" (May 22, 2017))).

Defendants had ample notice that their FEBC sales practices were unlawful. Although the November 18, 2015 Counsel Letter was ostensibly not an opinion letter, it identified significant and specific risk factors and provided advice. The most prescient portions of this advice came when counsel summarized a presentation by an FTC attorney regarding the TSR and upsell services like the ones FEBC purported to provide. As reported in the Counsel Letter, the FTC attorney identified the following "red flags of violations of the TSR":

- If the prices of the upsell service offered "were out of line with market norms," or "considered too high or unconscionable" (which would be an indication "that the additional service was an end-around the no-advance fee rule");

- If the upsell service was not "completely optional," but was instead "used as a 'gatekeeper' service" that was required to be "purchased first to access the debt relief program"; and

- If the upsell service was "bundled with debt relief services, including management (i.e. budget planning or counseling), negotiation or settlement."

*See* Appendix, Exhibit 26 at 3. In case the message was not clear, Frere's attorney summarized it for him: "as long as the FEBC membership plan is optional and not offered for a sum above the market rate, the fact that [AmeriTech] offers the additional product/services does not automatically raise red flags of violations of the TSR."

As discussed *supra*, FEBC was, as a practical matter, bundled with AmeriTech's document preparation services; clients were enrolled in, and billed for, both programs simultaneously. Consumers constantly complained that they did not know what their payments – including the FEBC payment – were getting them. Employees in Customer Relations to whom we spoke suggested that as much as 30% of calls fielded by the CS Department involved confusion about the nature of clients' monthly payments. Although FEBC was not explicitly a "gatekeeper" service, Defendants' sales scripting (and calls we have listened to) conflated FEBC

and AmeriTech's debt relief services at multiple, critical junctures. Our review has shown that many consumers were under the mistaken belief that the FEBC fee was going to the consumer's loan payment, or that FEBC was a free or low-cost service, ancillary to the document preparation services. In fact, the FEBC fee was the bulk of their monthly payment. Moreover, the metrics – a roughly 93% "upsell" success rate – strongly suggest that the customers were confused and did not understand the cost or "value" of FEBC.

Finally, FEBC's monthly premium clearly was not in line with market prices. The basic "services" offered with FEBC were access to documents and forms, all of which appear to be freely available online. If a consumer actually logged into his or her FEBC account, he or she would have the option to enroll in services like LifeLock or roadside assistance. If the consumer did not proactively choose to enroll in these services, Defendants would not be billed for them. Under no circumstances were these meager services equivalent to the $49, $75, or even $99 monthly payments that Defendants' financially-distressed clients were making to maintain their membership in FEBC.

2. <u>Nearly All Clients Were Enrolled in FEBC</u>

Reports pulled from Salesforce suggest that approximately 93% of clients enrolled with AmeriTech's were also enrolled in FEBC – an outrageously high number for an optional "upsell." During interviews, employees were quick to note that consumers could opt out of FEBC. However, if consumers did not understand the nature of the fees, they would not know to cancel. Moreover, our review of CS Department procedures has indicated that consumers must run an extensive gauntlet to cancel, including being transferred to "supervisors" in Retention.

We found examples of employee confusion and misunderstanding surrounding FEBC:

- A former sales agent said that he never knew what was included in FEBC until he transferred to the Verification Department. *See* Appendix, Exhibit 29 (Chat between Lorenzo Lemos and Jeremiah Cramer dated October 31, 2018 at 1:36 p.m.).
- When a co-worker asked how to explain FEBC, another employee described it as an "[o]ptional benefit that is included in the payments already quoted . . . ." *See* ,

Appendix, Exhibit 30 (Chat between Timothy Arquilla and Bryon Clark dated September 25, 2018 at 10:23 a.m.).

At the same time, other employees clearly understood the value of FEBC, and were incentivized to keep clients in the program.

- An employee noted that FEBC opt-outs cause the company to "lose a lot of money and give[ ] people 2 months before they have to make a payment." *See* Appendix, Exhibit 31 (Chat between Kaitlyn Gainey and John McNamara dated November 9, 2018 at 7:12 a.m.).

Concern about the high percentage of clients enrolled in FEBC had raised red flags with vendors at least once before. Global Client Solutions, LLC ("GCS"), an Oklahoma-based company that offers account management services to the debt settlement industry, began working with Defendants on or about December 8, 2015. GCS's role was to pull funds from Defendants' clients' accounts and hold them in escrow until Defendants provided the POP, at which point GCS would credit the funds to Defendants – the same service that RAM and AMP now provide to Defendants.

About nine months into GCS's relationship with Defendants, after handling numerous customer complaints and seeing how Defendants typically interacted with their customers, GCS began to question whether it could continue working with Defendants. GCS's main concern, as conveyed to one of Defendants' representatives, was that the allegedly "optional" services (*i.e.*, the ancillary education/financial management products) on which Defendants relied for the bulk of their revenue were not actually optional. GCS's in-house compliance personnel had calculated the rate of upsell for these services at 95%, far higher than the normal industry rate of 30-40%. GCS was concerned that the so-called optional services were not in fact optional, and that Defendants were engaging in illegal practices that would draw government scrutiny. GCS asked Defendants to provide evidence reassuring them that the optional services were truly optional, and not a *de facto* bundled charge.

///

///

The evidence reviewed by the Receiver shows that Defendants attempted to stave off GCS's termination of services while they searched for one or more replacements for GCS.[24] During this time frame, Defendants also began an internal project of reviewing GCS account balances and expediting POPs to GCS in order to claim as much of those balances as possible before GCS terminated the relationship or Defendants transitioned to a new account manager. Ultimately, Defendants did not provide the evidence that GCS required, and after being accepted by a new account management service in November 2016, Defendants began transitioning clients to that service in January 2017.

### 3. Consumers Did Not Use the FEBC Benefits

The benefits supposedly included with FEBC included third-party services such as LifeLock, roadside assistance, credit repair, and health savings plans. Defendants only paid for those third-party services, however, if the clients affirmatively signed up for them, and very few clients did. In fact, only 80 clients ever actually signed up for LifeLock and only 53 signed up for roadside assistance. This is out of a universe of tens of thousands of customers. Moreover, it does not appear that Defendants' employees were generally conversant about the services offered by FEBC membership, further suggesting that the services were essentially irrelevant. For example, in a December 19, 2017 chat, one sales agent asked another, "What do you say about Lifelock? We honestly know nothing back here about what they get with the enrollment [in FEBC]." *See* Appendix, Exhibit 32 (Dec. 19, 2017 chat).

Defendants nonetheless did their best to create the appearance, particularly after the GCS inquiry, that clients were actually using FEBC services. Verification employees instructed customers on how to create an FEBC password, agree to the FEBC terms and services, and click the final "Sign Up" button. *See* Appendix, Exhibit 33 ("AmeriTech Financial Student Loan Verification") ¶¶ 19-23. This made it appear that there were more clients using FEBC than there actually were.

---

[24] To analyze this issue, the Receiver and his counsel spoke to several witnesses with knowledge and reviewed hundreds of documents, including privileged communications the Receiver does not intend to waive at this time.

## F.     Forbearance

According to the Processing Supervisor, all clients would be put in a brief forbearance (about one month's time) immediately following enrollment in order to suspend payments while the necessary documents were collected.[25]  In its Order, the Court expressed concern that some clients might remain in forbearance longer than necessary, to their ongoing detriment:

> Additionally, Defendants routinely place borrowers' loans in forbearance, sometimes for lengthy periods, during which time borrowers are not required to make loan payments and loan servicers are prohibited from contacting borrowers. . . . Thus, consumers may be unaware that their loans are in forbearance, continuing in the belief that their monthly payments to Defendants are being applied to their student loans.

Order at 11.

The evidence we have reviewed indicates that this exact scenario occurred, possibly for thousands of clients.  Consumers were routinely placed in forbearance at the beginning of processing while the consumer's documents are collected.  This practice was not necessarily problematic, but could become so if a client became unresponsive, necessary documents or loan servicer login credentials were not obtained, and forbearance was extended.

This appears to have been a somewhat common problem.  In an email dated November 29, 2018, the day the Preliminary Injunction was issued, Ms. Ayala appeared to address this very issue, stating:

> The attached reports show clients who had a status check of 3 months ago or before but we do not have portal [access] to go in and complete the status check. All of these clients should have a General Forbearance on file, please go in and re-submit the forbearance for these clients.  The goal is to keep them as current as possible until we can get [access to] their [student loan web] portals. . . . A campaign is being worked on that auto dials clients who need web portals and connects them to CS, so we will still be reaching out to the client while we place a pro-active forbearance on their account.

*See* Appendix, Exhibit 34 (Nov. 29, 2018 Email, "Outdated Forbearance Status Checks.").  This conclusion is further supported by reports we ran in Salesforce, which showed that 2,103 of

---

[25]  Defendants do not necessarily need a client's login credentials to request a forbearance on the client' behalf; there is a general forbearance form that Defendants can fax to the servicer. However, they cannot access the client's account with the servicer to determine the status until they have the login credentials.

AmeriTech's 10,296 active clients were in forbearance. Thus, approximately 20% of Defendants' active AmeriTech clients were in forbearance, a seemingly high percentage given representations by the Processing Supervisor that clients were only initially put into a short forbearance while Defendants gathered the clients' documents.[26] *See* Appendix, Exhibit 24 (Salesforce Report – Client Breakdown by Status).

Our impression is that clients may have been kept in forbearance longer than advisable, but the data available to us does not provide a means to determine the number of clients whose loans were placed in an unnecessary forbearance. We also saw some suggestion that the Processing Department was understaffed as of the date of the Receiver's appointment, which may have exacerbated any existing problems.[27]

### G. Cost of Acquisition

One of the crucial costs for Defendants was the cost of acquiring customers. Every enrolled customer represented an enormous investment of time and money by Defendants, given the cost of the leads and the low rates at which consumers actually enrolled. Defendants tracked a figure they described as "cost per acquisition," or "CPA," which only accounted for the marketing costs of converting a lead into a client and did not account for business overhead. Mr. Cutter told us that if it cost $100 to buy ten leads, and sales agents closed one of those ten leads, the CPA would be calculated as $100. CPA would go up and down based on the quality of leads

---

[26] The Receiver does not mean to suggest that the Processing Supervisor was untruthful, and in fact, found her to be generally cooperative and truthful. Rather, the Receiver only notes that the standard practice as described may not practically be able to be followed in many cases, given that clients may be unresponsive to requests for the necessary documentation.

[27] For example, in a November 2, 2018 email, one member of the Processing department stated:

> Luke and I have been doing our best to keep the lists under control, but it's too much for 2 people. We focus mainly on Reapp 1, but we have to work on other lists too, and the progress we make on Reapp 1 in one day is quickly undone when we spend part/all of a day elsewhere which is enough time for more clients to populate onto Reapp 1 and we aren't able to keep up. . . . Having a dedicated person on Reapp 1 would probably go a long way to keeping it under control while Luke and I have to take time to work elsewhere like Reapp 2ABC, IBR 1 and Consol IBR, and the Case Lists.

*See* Appendix, Exhibit 35 (Nov. 2, 2018 Email, "IDR/Reapp work").

and the quality of the sales agents working the leads. Defendants' target CPA was around $254, although it was often much higher – one of Defendants' internal tracking documents showed daily CPA between February 12 and October 26, 2018 as low as $33 and as high as $913; using the figures in this spreadsheet, we were able to calculate the average CPA for that period as $286.42. *See* Appendix, Exhibit 36 (Pulse Report).

For a business that charged each client $800 for document preparation services, this was not, and is not, a viable proposition. This is evident in the QuickBooks files and other financial records of Defendants, which are included in the report of the Receiver's forensic account. *See* Appendix, Exhibit 37. That report indicates that during the periods covered by the report, AFBC and AmeriTech combined suffered aggregate net losses of $3.3 million while FEBC had net profits of $25.5 million.[28] In short, absent the monthly FEBC membership fees, the Defendants do not have an ongoing business – and for the reasons discussed above, we do not believe continuing FEBC is feasible.

### H. Could Illegal Practices be Remedied?

A business providing student loan document preparation services to student loan debtors is not inherently illegal. However, running a documentation preparation operation which complies with TSR is challenging at best. Costs to acquire customers (as discussed above) are very high. Revenue horizons would be extremely long, as the funds can only be taken after a payment plan is accepted and the customer has made an initial payment to a loan servicer. One need look no further than the Corporate Defendants' operation for evidence of how difficult it is to operate in this field. Defendants lost large amounts of money on the document preparation aspect of the business. To overcome the profit challenge, they resorted to deceptive sales practices and, with respect to AFBC, continued to extract illegal advance fees.

In theory, illegal advance fees could be removed from the business model and an aggressive compliance program could be implemented to curtail deception. But a real compliance program would be expensive, and compliant sales practices would generate fewer

---

[28] This does not include intercompany transfers. Revenues from FEBC were regularly swept into AmeriTech such that it appeared on paper that AmeriTech was healthier than it was.

sales.  Even with advance fees and predatory sales practices, Defendants lost money on document preparation.  Results would be exponentially worse without those advance fees and predatory practices.

FEBC is not a salvageable business on any basis.  Quite simply, it cannot be operated legally.  It was formed with a treacherous motive – to avoid collecting advance fees for student debt relief programs as forbidden by law and regulation.  FEBC relied on confusing and deceptive sales tactics to lure financially desperate individuals into paying as much as $99 a month for nominal services unrelated to their student loans.  FEBC's services were marketed as part of a "program" for the ostensible purpose of reducing customers' student loan debts.  Unsuspecting customers thought their monthly payments were paying off their loan, and the overwhelming majority of them did not even use FEBC's services.

Yet, FEBC was massively profitable – accounting for $26 million of Defendants' aggregate net revenues and 100% of their aggregate profits.  It was the financial engine that drove Defendants' entire business; in sharp contrast, AmeriTech was the loss leader that provided Defendants with sufficient cover to charge FEBC's monthly fees under the guise of offering document preparation services to reduce student loans.  I have concluded that without FEBC and its massive profits, the remainder of the business cannot continue to operate as a viable business.

## V.

## FINANCIAL INFORMATION

The Receiver's forensic accountant, Lisa Jones, has reviewed the available financial records of the Receivership Entities, principally QuickBooks data, and prepared a preliminary accounting report.  *See* Appendix, Exhibit 37.  As the report notes, the findings are preliminary, based on a review of available data to date, and limited in scope and accuracy to the data input by Defendants into the QuickBooks files.

For purposes of this Preliminary Report, the most material conclusions of this accounting report are as follows:

///

- From 2011 - 2018, the QuickBooks records of the Corporate Defendants indicate aggregate net receipts from consumers of $70.1 million less aggregate expenses of $47.9 million, for net income of $22.2 million. The sources of those receipts were AFBC sales ($33.1 million), ATF document preparation ($10.3 million), and FEBC membership fees ($26.7 million).

- Against $26.7 million in net consumer receipts, FEBC recorded expenses for cost of goods at $567,757 resulting in a gross profit of $26.1 million. FEBC's other expenses were $432,813 in administrative and staff expense and $167,156 in income taxes, resulting in an after-tax net income for FEBC alone of $25.5 million. Hence, without the FEBC membership fees, there were no profits.

- Against $43.4 million in net consumer receipts, the non-FEBC components of the business recorded total expenses of $46.8 million for an aggregate net loss of $3.3 million.

## VI.

## CONCLUSION

The Receiver respectfully submits this Preliminary Report.

Dated: December 21, 2018             McNamara Smith LLP

By:___/s/ Thomas W. McNamara_____
        Court-appointed Receiver

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2018, the foregoing document, **PRELIMINARY REPORT OF RECEIVER**, was electronically transmitted to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.


  /s/ Edward Chang
Edward Chang
*Attorneys for Court-appointed Receiver,*
*Thomas W. McNamara*